# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LYNX WHOLE LOAN ACQUISITION LLC, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| NATIONSTAR MORTGAGE, LLC, | ) ) ) | |
| Defendant, | ) ) | |
| _____ | ) | CONSOLIDATED |
| NATIONSTAR MORTGAGE LLC, | ) ) | C.A. No. 2022-1203-LWW |
| Counterclaim Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| LYNX WHOLE LOAN ACQUISITION LLC, and ALLIED FIRST BANK, S.B., | ) ) ) ) ) | |
| Counterclaim Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: August 20, 2024
Date Decided: December 3, 2024

Bradley R. Aronstam, Garrett B. Moritz, Reiko Rogozen & Anthony Calvano, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; David M. Grable, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Los Angeles, California; Manisha M. Sheth, Wing F. Ng, Alex Zuckerman & Jeffrey C. Arnier, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; Veronica B. Bartholomew, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware; *Counsel for Plaintiff and Counterclaim Defendant Lynx Whole Loan Acquisition LLC and Counterclaim Defendant Allied First Bank, S. B.*

Daniel A. Mason & Elizabeth Wang, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Richard Jacobsen & Thomas Kidera, ORRICK HERRINGTON & SUTCLIFFE LLP, New York, New York; *Counsel for Defendant and Counterclaim Plaintiff Nationstar Mortgage LLC*

**WILL, Vice Chancellor**

This breach of contract action arises from purchases of distressed, federally insured mortgage loans in late 2021 and early 2022. Lynx Whole Loan Acquisition, LLC paid $2.7 billion to buy the loans from Nationstar Mortgage, LLC. Nationstar represented and warranted to Lynx that the loans sold were accurately described. Nationstar, which would continue as servicer after the sale, also represented and warranted that it would service the loans consistent with regulatory guidelines.

Lynx claims that Nationstar breached these representations and warranties in a hodgepodge of ways. After trial, I conclude that some of Lynx's theories fail. Others—regarding the accuracy of Nationstar's descriptions of the loans and compliance with a specific guideline—succeed. Lynx is entitled to indemnification damages for the breaches it proved, and for the value that a third-party appraiser ascribed to mortgage servicing rights.

After Lynx discovered Nationstar's breaches, it terminated Nationstar as loan servicer. Nationstar brings counterclaims against Lynx and the successor servicer for repayment of servicing advances it made on Lynx's behalf. Lynx, in turn, asserts that Nationstar improperly retained certain funds owed to the successor servicer. Both claims have merit. I fashion a remedy that addresses the respective harms.

## I.    BACKGROUND

The following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1]

### A.    Nationstar's Business

Nationstar Mortgage LLC (a/k/a Mr. Cooper) is a Delaware limited liability company.[2]  Nationstar originates and services home mortgages that are guaranteed by the federal government and may become eligible for delivery into pools of mortgage-backed securities (MBS) issued by the Government National Mortgage Association (GNMA).[3]  Payments of principal and interest due to purchasers of the MBS are also guaranteed by GNMA.[4]

---

[1] Joint Pre-trial Stipulation and Order (Dkt. 301) ("PTO").  The trial record includes the testimony of 23 fact and 6 expert witnesses over 5 trial days, and 2,175 exhibits.  Facts drawn from exhibits jointly submitted by the parties are referred to by the numbers provided on the parties' joint exhibit list and cited as "JX __" unless otherwise defined.  *See* Dkt. 300 (joint exhibit list).  Pincites for joint exhibits refer to the page of the exhibit as marked rather than internal or Bates pagination, unless otherwise noted.  Deposition transcripts are cited as "[Name] Dep."  Trial testimony is cited as "[Name] Tr."  *See* Dkts. 329-333.

[2] PTO ¶ 6.

[3] *Id.* ¶ 36.

[4] *Id.*

Servicers like Nationstar deliver qualifying loans into GNMA MBS pools.[5] GNMA then securitizes the loans, and Nationstar sells the securities to third-party investors in the market for MBS.[6]

The right to service—and earn fees from—the underlying loans is distinct and severable from ownership of the loan itself.[7] Lenders may sell loans to investors while retaining the servicing rights.[8] Here, Nationstar derived fee revenue from principal and interest payments on mortgage loans it sold to plaintiff Lynx Whole Loan Acquisition, LLC—a Delaware entity—and continued to service.[9]

### B.     Early Buyout Option Loans

The mortgage loans Nationstar sold to Lynx were early buyout option (EBO) loans. EBO loans are a category of GNMA loans that are 90 days or more past due.[10] Servicers may repurchase EBO loans from GNMA to remove them from the MBS pool before default.[11] Exercising an EBO eliminates the servicer's obligation to continue advancing principal and interest but requires the servicer to pay off the

---

[5] *Id.* ¶ 37.

[6] *Id.* ¶ 36.

[7] *Id.* ¶ 38.

[8] *Id.*

[9] *Id.* ¶¶ 4, 39.

[10] *Id.* ¶ 41.

[11] *Id.*

remaining principal balance on the nearly defaulted loan.[12]  If an EBO loan comes out of delinquency or "reperforms," it becomes eligible to be redelivered to a GNMA pool and re-securitized.[13]

Non-bank servicers (like Nationstar) sell EBO loans to investors (like Lynx) and use the cash flows from the sales to pay off the loans' remaining principal balance.[14]  In EBO transactions like those at issue here, an investor will buy a portfolio of EBO loans from a servicer, and the servicer will retain the mortgage servicing rights (MSRs).[15]  When an investor purchases an EBO loan, the loan may take three paths—other than foreclosure or liquidation—to become eligible for redelivery into a GNMA pool.[16]

First, the borrower can resume payment without changes to the original loan terms and pay all amounts past due.[17]  This path is known as a "natural cure."[18] Second, the servicer can defer the borrower's unpaid principal and interest payments, resulting in a standalone debt payable upon maturity of the loan that is

---

[12] *Id.*

[13] *Id.* ¶ 42.

[14] *Id.* ¶ 43.

[15] *Id.* ¶ 44.

[16] *Id.* ¶ 45.

[17] *Id.* ¶ 46.

[18] *Id.*

subordinate to the original loan.[19]  Such deferral is known as a "partial claim."[20]

Third, and most relevant here, the servicer can work with the borrower to renegotiate modified loan terms—typically a lower monthly payment, lower interest rate, or longer term.[21]  The modification is deemed complete and the loan rehabilitated when the borrower makes payments under the revised terms.[22]

### C.    Lynx and Nationstar's Agreement

The COVID-19 pandemic visited sudden financial distress upon borrowers with government-backed mortgages.  To address borrowers' unforeseen hardship, federal agencies launched forbearance programs in March 2020 that temporarily paused or reduced mortgage payments.[23]

Although borrowers availed themselves of these federal forbearance programs, the programs did not excuse Nationstar from advancing principal and interest payments for the loans it serviced.[24]  For Nationstar, exercising EBOs freed it from advancement obligations for loans that could be in forbearance for an

---

[19] *Id.* ¶ 47.

[20] *Id.*

[21] *Id.* ¶ 48.

[22] *Id.*

[23] *Id.* ¶ 51.

[24] JX 1091 at 2-3.

5

indeterminate period. But, to exercise EBOs, Nationstar first had to pay the principal balance on the underlying loans.[25]

To lessen these costs, Nationstar sought buyers for the loans. This approach was attractive to Nationstar since it would immediately obtain cash flows to offset the costs of exercising the EBOs.[26] Purchasing the EBO loans was also appealing to potential buyers. Many EBO loans carried higher interest rates than the historically low rates available in 2021.[27] Any economic benefit realized by the buyer would come later, however, depending on the quality of the loans sold and the seller's servicing of the loans.[28]

Lynx emerged as a potential buyer of Nationstar's EBO loans in the fourth quarter of 2020.[29] Lynx would own the loans. Nationstar would retain the associated MSRs and continue servicing the loans.[30]

On November 1, 2021, Lynx and Nationstar entered into a Flow Mortgage Loan Sale and Servicing Agreement (the "Agreement"), which outlined the framework for Lynx's purchase.[31]

---

[25] *Id.*; Watts Tr. 16.

[26] PTO ¶ 43.

[27] JX 1091 at 1-2.

[28] *See* Watts Tr. 22.

[29] PTO ¶ 54.

[30] *Id.*

[31] JX 74 ("Agreement") 1; PTO ¶ 55.

Over a five-month period ending April 1, 2022, Lynx purchased 15,341 government-backed mortgage loans from Nationstar in seven transactions totaling an unpaid principal balance of $2.655 billion.[32] All of the purchased loans were delinquent ones on which Nationstar had exercised an EBO.[33] At each of the seven closings, Lynx paid Nationstar (1) the par value of the loans, which Nationstar used to buy the loans out of securitization, and (2) a premium.[34] Nationstar received more than $50 million in upfront profit across the seven transactions and eliminated its obligation to advance principal and interest on the delinquent MBS loans.[35]

As servicer, Nationstar would remain responsible for the "care and feeding" of the loans Lynx purchased.[36] Nationstar also had superior access to information about the loans being sold. Lynx therefore bargained for promises and protections from Nationstar in the Agreement.

### 1. Accuracy and Completeness of Loan Information

Nationstar made representations and warranties about the accuracy and completeness of information it provided to Lynx about characteristics of the loans.

---

[32] PTO ¶ 59 (noting the closing dates for the seven transactions: November 1, 2021; December 1, 2021; December 1, 2021; December 28, 2021; January 3, 2022; February 1, 2022; and April 1, 2022).

[33] *Id.*

[34] Watts Tr. 21-22.

[35] *See* JX 2109 (*see* App. 11 tab).

[36] *See* Hasan Tr. 487.

7

These representations were important to Lynx for two reasons. First, loan value is affected by the loans' characteristics.[37] Second, it "would be impossible" for Lynx to review the voluminous loan files, which span "thousands of documents per loan," during the period between the purchase population being set and closing.[38]

In Section 3.01(a)(x) of the Agreement, Nationstar represented and warranted in its capacity as seller that:

> Neither th[e] Agreement nor any statement, report or other document furnished or to be furnished in writing by or on behalf of [Nationstar] pursuant to th[e] Agreement or in connection with the transactions contemplated [t]hereby contain[ed] any untrue statement of fact or omit[ted] to state a fact necessary to make the statements contained therein not misleading[.][39]

Nationstar also agreed to execute a separate contract memorializing each of the seven transactions, called an Assignment and Conveyance Agreement (AACA).[40] In each AACA, Nationstar agreed to provide a mortgage loan schedule (MLS) that outlined data points or characteristics for every loan in the portfolio it sold to Lynx.[41] Each MLS effectively provided an inventory of the loans being sold.[42]

---

[37] *See* Summers Tr. 438.

[38] *See* Watts Tr. 24.

[39] Agreement § 3.01(a)(x).

[40] PTO ¶ 59.

[41] Agreement § 2.01.

[42] Hasan Tr. 493; Meacham Tr. 1023; *see also* Agreement § 1.01; *id.* § 2.01 ("As of each Closing Date, the Seller shall absolutely and irrevocably sell, transfer, assign, set over and

In Section 3.02(a) of the Agreement, Nationstar represented and warranted to provide "true, correct, and complete" information in the MLS:

> All information set forth in the Mortgage Loan Schedule is true, correct and complete in all material respects as of the Principal Cut-off Date. The Mortgage Loan Schedule contains all of the data fields required to be included therein. The information set forth in the Mortgage Loan Schedule correctly and accurately reflects the data in the [Nationstar's] books and records as of the related Principal Cut-off Date and is consistent with the information reflected in the Mortgage File.[43]

Nationstar also confirmed the accuracy and completeness of information it would provide to Lynx after closing. This was important to Lynx since Nationstar would remain servicer, and its servicing could affect the loans' values.[44] In Section 3.01(b)(ix) of the Agreement, Nationstar represented and warranted in its capacity as servicer that:

> Neither th[e] Agreement nor any statement, report or other document furnished or to be furnished by [Nationstar] pursuant to th[e] Agreement or in connection with the transactions contemplated hereby contain[ed] any untrue statement of fact or omit[ted] to state a fact necessary to make the statements contained therein not misleading.[45]

---

convey to Purchaser, without recourse, free and clear of any liens, security interests or other encumbrances, but subject to the terms of this Agreement and the related Assignment and Conveyance Agreement all right, title and interest in and to the Mortgage Loans (other than the related Servicing Rights) specified in the Mortgage Loan Schedule appended to the related Assignment and Conveyance Agreement.").

[43] Agreement § 3.02(a); *see also id.* § 1.01.

[44] *See infra* Section II.A.1.a.

[45] Agreement § 3.01(b)(ix).

2. Applicable Requirements and Customary Servicing Procedures

Nationstar represented and warranted in Section 4.01(a) of the Agreement to service loans in accordance with "Applicable Requirements and Customary Servicing Procedures."[46] "Applicable Requirements" were defined to include guidelines imposed by certain federal agencies, including Federal Housing Administration (FHA) and Department of Veterans Affairs (VA).[47] Certain guidelines bear on loan modifications, which could affect loan value.[48]

Nationstar also represented and warranted that, during the term of the Agreement, it had "not violated any Applicable Requirement in a manner that reasonably could be expected to have a material adverse effect upon the value of any Mortgage Loan."[49]

---

[46] Agreement § 4.01(a) ("The Servicer, as an independent contractor, shall service and administer the Mortgage Loans on an actual/actual basis on behalf of the Purchaser and any subsequent holder or holders of the Mortgage Loans in accordance with Applicable Requirements and Customary Servicing Procedures, and using not less than the same degree of care, diligence, and prudence that the Servicer uses when servicing mortgage loans of the same type as the Mortgage Loan for the Servicer's own account [.]"); *see also id.* § 3.01(b)(v).

[47] *Id.* § 1.01.

[48] *See infra* Section II.A.2.b.

[49] Agreement § 3.01(b)(vi).

10

### 3. Repurchase and Indemnification Rights

Lynx bargained for two monetary remedies if Nationstar breached the Agreement: repurchase and indemnification damages.

Regarding repurchase damages, Nationstar could be made to pay a defined repurchase price for any loan affected by an uncured breach of a representation and warranty that "materially and adversely affect[ed] . . . the value . . . of such Mortgage Loan or [Lynx's] interest therein[.]"[50]

As to indemnification, Lynx could recover "any and all out-of-pocket costs, damages, expenses, fees (including reasonable attorneys' fees incurred in connection with the enforcement of the Seller's repurchase, indemnification and other obligations hereunder), fines, penalties, forfeitures, judgments, liabilities, and other losses" arising from breaches of Nationstar's representations and warranties.[51]

### D. Lynx's First Demand

The final loan sale closed on April 1, 2022.[52] By this point, interest rates had risen.[53] Lynx experienced losses on its investment, particularly with respect to

---

[50] Agreement § 3.03(a); *see infra* Section III.A.1 (discussing Lynx's request for repurchase damages).

[51] Agreement § 3.03(c); *see infra* Section III.A.2 (discussing Lynx's request for indemnification damages).

[52] PTO ¶ 59.

[53] *See* JX 3007 at 1.

profits it anticipated making through its hedging strategy.[54]

Lynx's deal lead Brandon Watts flagged three primary concerns to his counterpart at Nationstar, Christopher Said. First, Lynx expressed that certain loans Nationstar sold it had preexisting modified interest rates that had not been disclosed on the associated MLSs. Second, Lynx believed that Nationstar had modified loan rates below applicable servicing standards. And third, Lynx observed that Nationstar had modified loans at a pace slower than the applicable guidelines required.[55]

On September 2, 2022, Lynx sent Nationstar a letter invoking its audit and information rights under the Agreement.[56] Nationstar ignored this letter. It responded to a follow-up letter and refused to comply.[57]

On December 13, Lynx sent Nationstar another demand letter listing multiple alleged breaches of the Agreement and events of default.[58] Lynx stated that it was terminating Nationstar as servicer under Section 9.01 of the Agreement and transferring the MSRs to another provider.[59] Lynx attached three schedules to its

---

[54] *See* JX 307.

[55] JX 303 at 1; Watts Tr. 87-88.

[56] JX 482 at 2-3.

[57] JX 2100; JX 2101.

[58] JX 591 at 5-6.

[59] *Id.* at 6-7.

letter. Schedule 1 listed loans that Lynx identified for repurchase.[60] Schedule 2 listed loans identified for indemnification.[61] And Schedule 3 listed loans for which Lynx exercised its termination rights against Nationstar as servicer.[62]

Nationstar responded a week later, disputing Lynx's allegations.[63] It refused to step down as servicer.

### E. This Litigation

On December 28, Lynx sued Nationstar in this court.[64] Lynx sought expedited declaratory relief on the validity of Lynx's termination of Nationstar as servicer.[65] Lynx sought to transfer the MSRs to a different servicer—counterclaim defendant Allied First Bank, S.B. ("Servbank").[66]

Within days of the lawsuit being filed, Nationstar agreed to resign as servicer.[67]

---

[60] JX 592 (Sched. 1).

[61] *Id.* (Sched. 2).

[62] *Id.* (Sched. 3).

[63] JX 917.

[64] PTO ¶ 67; Dkt. 1.

[65] PTO ¶ 67; Dkt. 1 ¶ 17.

[66] PTO ¶¶ 68, 71.

[67] *Id.* ¶ 71; *see* Dkt. 8; Watts Tr. 104.

**F.     The Valuation Dispute**

Nationstar's resignation as servicer triggered a contractual "Servicing Rights Valuation" process, which is defined by the Agreement as "a written determination of the Servicing Rights Value . . . of the Servicing Rights related to all Bifurcated Mortgage Loans."[68]   The valuation is to be performed by a "Servicing Rights Valuation Provider," meaning "any . . . nationally recognized provider of valuation services chosen at [Lynx's] election in [Lynx's] sole discretion."[69]   The provider is to determine the "Servicing Rights Value," which is the fair market value of the MSRs as of the transfer date, excluding unrecovered servicing advances.[70]   If the Servicing Rights Value is positive, Lynx is to pay Nationstar the fair market value of the MSRs.[71]   If the value is negative, Nationstar is to pay Lynx.[72]

Lynx initially engaged Situs AMC to perform the valuation.[73]   But after Lynx raised questions about Situs's independence from Nationstar, the parties agreed to

---

[68] Agreement § 10.02.

[69] *Id.* § 10.02(3).

[70] *Id.* § 10.02.

[71] *Id.* § 10.02(1).

[72] *Id.* § 10.02(2).

[73] *See* Watts Tr. 107.

engage Mortgage Industry Advisory Corporation (MIAC) instead.[74] MIAC performed both an economic and fair market valuation of the MSRs.[75]

On March 22, 2023, MIAC delivered a report valuing the MSRs at negative $23.6 million.[76] Nationstar declined to pay that amount and sought an order from this court directing Situs to conduct a new valuation.[77]

While the valuation dispute was ongoing, Lynx filed an amended complaint in this court on March 30.[78]

### G.    Servicing Rights Transfer

On April 20, Nationstar agreed to transfer the MSRs to Servbank.[79] Their previous resignation triggered an obligation for Nationstar to deliver to Servbank all funds in an escrow account for the loans.[80] Nationstar retained $13.2 million from the escrow account before transferring the rest of the money to Servbank.[81]

Nationstar kept the funds to offset servicing advances it had made for Lynx's loans while Nationstar was the servicer. A servicing advance is a payment to cover

---

[74] PTO ¶ 73.

[75] *See infra* Section II.B.1.b.

[76] JX 662 at 1-2.

[77] Dkt. 47.

[78] PTO ¶ 82; Dkt. 71.

[79] PTO ¶ 88.

[80] *See* Agreement §§ 4.08, 12.01.

[81] Dkt. 349 (Tr. of August 2, 2024 Post-trial Oral Arg.) 74.

certain third-party costs and expenses like taxes, property preservation or foreclosure costs, and insurance premiums made on behalf of borrowers who are delinquent on their mortgages.[82] As servicer, Nationstar was responsible for making these servicing advances. The Agreement required Servbank, as the successor servicer, to make arrangements to reimburse Nationstar.[83]

Neither Servbank nor Lynx have reimbursed Nationstar for these servicing advances.[84]

## H. Lynx's Second Demand and Second Amended Complaint

On August 7, 2023, Lynx sent another letter to Nationstar demanding repurchase of and indemnification for certain loans.[85] Lynx attached two schedules

---

[82] PTO ¶ 52; Agreement § 1.01 (defining "Servicing Advances" as "[a]ll customary, reasonable and necessary 'out of pocket' costs and expenses incurred by the Servicer in the performance of its servicing obligations, including, but not limited to, the cost of (i) the preservation, restoration and protection of the Mortgaged Property, (ii) any enforcement or judicial proceedings, including foreclosures, (iii) the management (including reasonable fees in connection therewith) and liquidation of the Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the Mortgage, (iv) Escrow Payments, if applicable, (v) any loss mitigation actions permitted under and in accordance with the provisions of this Agreement, (vi) the payment of delinquent HOA fees, and (vii) compliance with the obligations under Section 4.11.").

[83] Agreement § 12.01; *see infra* Section II.B.2.a (addressing Nationstar's counterclaim for reimbursement of the servicing advances).

[84] Dkt. 349 at 171.

[85] JX 727.

to its second demand letter. Schedule 1 listed loans identified for repurchase and Schedule 2 listed loans identified for indemnification.[86]

Nationstar responded three weeks later. It wrote that Lynx had failed to identify a cognizable breach of the Agreement or facts supporting its repurchase and indemnification demands.[87]

This response prompted Lynx to move for leave to file an amended complaint, which was granted.

On September 8, Lynx filed its Verified Second Amended and Supplemental Complaint (the operative "Complaint").[88] Lynx advances four counts. The first is a breach of contract claim regarding Nationstar's representations and warranties in the Agreement.[89] The second is a breach of contract claim for Nationstar's failure to pay the Servicing Rights Value and for its retention of certain escrow funds.[90] The third count seeks declarations that: "(1) Nationstar must abide by the [Servicing Rights Valuation] and pay Lynx $23 million dollars; (2) Nationstar has no right to the funds it has looted from borrower escrow accounts; and (3) Nationstar is not

---

[86] *Id.* at 9-96.

[87] JX 918 at 2.

[88] PTO ¶¶ 99-100; Dkt. 156 ("Compl.").

[89] Compl. ¶¶ 213-35.

[90] *Id*. ¶¶ 236-44.

17

entitled to reimbursement of Servicing Advances from Lynx."[91]  The fourth seeks a contractual award of attorneys' fees under Section 12.16, the Agreement's fee-shifting provision.[92]

On November 3, Nationstar counterclaimed against both Lynx and Servbank (the "Counterclaims").[93]  Nationstar advances five claims.  The first is a breach of contract counterclaim for Lynx's purported failure to procure a Servicing Rights Valuation.[94]  The third is breach of contract counterclaim regarding the unpaid servicing advances.[95]  The second and fourth counterclaims are brought in the alternative for breaches of the implied covenant of good faith and fair dealing.[96]  The fifth counterclaim is for unjust enrichment, regarding the unreimbursed servicing advances.[97]  The sixth counterclaim seeks attorneys' fees under the Agreement's fee-shifting provision.[98]

---

[91] *Id.* ¶ 247.

[92] *Id.* ¶¶ 249-51.

[93] PTO ¶ 104; Dkt. 196 ("Countercl.").

[94] Countercl. ¶¶ 125-31.

[95] *Id.* ¶¶ 141-51.

[96] *Id.* ¶¶ 132-40, 152-62.

[97] *Id.* ¶¶ 163-66.

[98] *Id.* ¶¶ 167-69.

The parties went on to cross-move for partial dismissal of certain claims and counterclaims.[99] On March 5, 2024, I delivered a bench ruling denying the motions in full.[100] Each cause of action in the Complaint and Counterclaims remained for trial.

A five-day trial began on May 6. Post-trial briefing and argument were completed on August 2. The case was taken under advisement at that time.

## II. ANALYSIS

The parties bear the burden of proving their respective claims and counterclaims by a preponderance of the evidence. "Proof by a preponderance of the evidence means proof that something is more likely than not."[101]

The Agreement is governed by New York law.[102] Under New York law, a party claiming a breach of contract must establish that "(1) a contract exists . . . (2) [the] plaintiff performed in accordance with the contract . . . (3) [the] defendant breached its contractual obligations . . . and (4) [the] defendant's breach resulted in damages."[103]

---

[99] Dkts. 177, 197, 205, 233, 245, 251.

[100] PTO ¶ 111; Dkts. 265, 266.

[101] *Revolution Retail Sys., v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *9 (Del. Ch. Oct. 30, 2015).

[102] Agreement § 12.05.

[103] *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y. 3d 44, 52 (2022) (citation omitted).

New York courts view "the best evidence of what parties to a written agreement intend [to be] what they say in their writing."[104]  As such, "a written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms."[105]  "Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the court to decide."[106]

## A.    Lynx's Breach of Contract Claims

Lynx's breach of contract claims against Nationstar fall into three categories.

One category concerns Nationstar's representations and warranties in its capacity as seller.  Lynx contends that Nationstar failed to disclose that certain loans were in the process of being modified, despite representing and warranting to the accuracy and completeness of information provided to Lynx.  Lynx proved this claim.

The second category concerns Nationstar's representations and warranties as servicer of the loans post-closing.  Lynx alleges that Nationstar breached these representations and warranties in three ways, because: (1) modified interest rates

---

[104] *Slawmow v. Del Col*, 79 N.Y.2d 1016, 1018 (1992).

[105] *Greenfield v. Philles Records, Inc.*, 98 N.Y. 2d 562, 569 (2002).

[106] *Id.* at 569-70 ("[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity.").

were too low; (2) modification and redelivery timelines were too slow; and (3) Nationstar's facilities, procedures, and personnel for servicing were substandard. Lynx has only proven a subset of the second alleged breach.

The third category pertains to Nationstar's actions after it was terminated as servicer. Lynx proved that Nationstar breached the Agreement by refusing to step down from that role. Lynx's claim about Nationstar's retention of certain escrow funds is addressed alongside Nationstar's related counterclaim on servicing advances.

### 1. Nationstar's Alleged Breaches Regarding Modifications in Progress

A loan modification is a change to the terms of an existing mortgage loan, which can include changes to the interest rate, the unpaid principal balance, and/or the term to maturity.[107] Nationstar and Lynx understood the terms "modifications in progress" or "modifications in process" to mean a loan for which Nationstar as servicer had approved and offered a modification to a borrower (e.g., a change to the interest rate), which the borrower had yet to accept by executing the modification documents.[108]

---

[107] Latman Tr. 1145-46.

[108] *See* Watts Tr. 32-33 (testifying that modification in progress means "when a rate lock occurs, and new terms . . . for our borrower are locked in and offered to a borrower"); Schiffer Tr. 166-67; *see also* JX 154 at 6. The parties also referred to modifications in progress as "modifications in flight" (or "mods-in-flight") and "active mods." *See* Said Tr. 389; Schiffer Tr. 167.

One type of modification in progress is a trial modification. A loan subject to a trial modification involves a probationary payment period during which the borrower makes several scheduled payments under the terms of the proposed loan modification.[109] The proposed loan modification only takes effect after the borrower makes the set trial payments under the modified terms.[110] The trial period extends the time during which a modified loan is ineligible for redelivery into a GNMA pool.[111]

Lynx claims that Nationstar breached three provisions of the Agreement by failing to accurately disclose modifications in progress. Section 3.01(a)(x) is a representation by Nationstar that "[n]either th[e] Agreement nor any statement, report, or other document furnished or to be furnished in writing . . . contain[ed] any untrue statement of fact or omit[ted] to state a fact necessary to make the statements contained therein not misleading."[112] Nationstar made the same representation in its capacity as servicer in Section 3.01(b)(ix).[113] And in Section 3.02(a), Nationstar represented that the information in the MLSs it provided to Lynx was "true, correct

---

[109] Hasan Tr. 521-22; *see also* JX 14 ¶ 19; JX 17.

[110] *See* Latman Tr. 1151.

[111] Said Tr. 394-95.

[112] Agreement § 3.01(a)(x); *see supra* note 39 and accompanying text (full text of provision).

[113] *Id.* § 3.01(b)(ix); *see supra* note 45 and accompanying text (full text of provision).

and complete in all material respects" and "contain[ed] all of the data fields required to be included therein."[114]

Lynx asserts that these provisions were breached in two ways. The first type of alleged breach concerns information provided in the MLS for each of the seven loan pools. The second relates to statements made by Nationstar representatives during negotiations about the composition of the loan pools. Lynx has proven its claim regarding the former but not the latter.

### a. Disclosure of Modifications in Progress in MLSs

Under New York law, "strict or absolute liability" is imposed for "untrue or incorrect statement[s] on the MLS" in breach of related representations and warranties.[115]

Nationstar attached an MLS spreadsheet as Annex 2 to the AACA for all seven sale transactions. The MLS provided loan-level information as of closing for every loan sold to Lynx.[116] Nationstar was required to provide 61 specific data fields in the accompanying MLS.[117] One of the mandatory fields was called

---

[114] *Id.* § 3.02(a); *see supra* note 43 and accompanying text (full text of provision).

[115] *U.S. Bank, Nat'l Assoc. v. UBS Real Est. Sec., Inc.*, 205 F. Supp. 3d 386, 428-29 (S.D.N.Y. 2016); *see also MBIA Ins. Corp. v. Credit Suisse Secs. LLC*, 2020 WL 7041787, at *7-8 (Sup. Ct. N.Y. Cty. Nov. 30, 2020).

[116] *See* Hasan Dep. 45-47.

[117] Agreement 75-76 (Annex 2 listing the data fields in the MLSs Nationstar agreed to provide).

"active_modification_flag."[118] This field was intended to capture modifications in progress.[119]

Nationstar included the "active_modification_flag" in the MLS it supplied for the first loan pool sold on November 1, 2021.[120] For this transaction, the "active_modification_flag" was filled with either a "1" or a "0." Loans denoted with "0" meant that there was no modification in progress.[121] If the field was populated with a "1," it meant that there was a modification in progress.[122] The Nationstar team responsible for preparing the MLS neither worked to understand what the "active_modification_flag" meant nor confirmed the accuracy of the information in the field.[123]

Nationstar failed to provide the "active_modification_flag" field for the second through seventh loan pools sold between December 1, 2021 and April 1,

---

[118] *Id.*

[119] *See* Watts Tr. 56; Schiffer Tr. 166-67; DelPonti Tr. 720 (Lynx's expert testifying about his understanding of the active modification flag based on his industry experience); JX 847 ("DelPonti Rep.") 50; *cf.* Ross Tr. 1382.

[120] JX 75 column "BB".

[121] *See* DelPonti Rep. 50-52; Said Tr. 320.

[122] *See* DelPonti Rep. 50-52; Said Tr. 320.

[123] *See* Hasan Tr. 505-07, 510; Said Tr. 415-16; Richardson Tr. 568-76. At trial, Nationstar's transaction manager for the loan sale to Lynx testified that the data field meant a modification that had been completed. Richardson Tr. 581. But he could not explain an example loan with a "1" in the "active_modification_flag" field where the modification documents were not returned and executed as of November 1, 2021. Richardson Tr. 581-86. His testimony is inconsistent with both the weight of the record and the fact that the field explicitly refers to "active" modifications.

2022. For these six sales, Nationstar provided a "mod_trial" field that was meant to capture whether the loan was in a trial modification period.[124] The "mod_trial" field was not one of the 61 fields agreed upon by the parties.[125]

If there were any trial modifications in a pool, Lynx expected Nationstar to populate the "mod_trial" field with a "1."[126] If the loan was not subject to a trial modification, Lynx expected the field would read "0." But the "mod_trial" field instead read "NULL" for every row.[127] No Nationstar witness at trial was familiar with the "mod_trial" flag.[128]

i.        *Nationstar's Breaches*

Regarding the first sale and associated MLS, Nationstar breached its representations and warranties that any document furnished to Lynx—including the MLSs—be true, accurate, and complete.[129] It did so by including inaccurate information about modifications in progress for certain loans in the first pool.[130]

---

[124] *See, e.g.*, JX 93 at 13.

[125] *See* Agreement 75-76 (Annex 2).

[126] Watts Tr. 60-61.

[127] DelPonti Tr. 721; *see, e.g.*, JX 93 at 13.

[128] *See, e.g.*, Ross Tr. 1382-83.

[129] Agreement §§ 3.01(a)(x), 3.01(b)(ix), 3.02(a).

[130] *See infra* Section II.A.1.a.ii.

Nationstar's omission of the "active_modification_flag" field from the second through seventh MLSs also breached the Agreement.[131] Section 3.02(a) of the Agreement obligated Nationstar to provide an MLS containing "all of the data fields required to be included therein."[132] Appendix 2 to each AACA specified that "active_modification_flag" was a required data field.[133]

Nationstar was not obligated to include the "mod_trial" field and Lynx did not request it. But Nationstar was prohibited from "omitting to state a fact necessary to make the statements contained [in any furnished report] not misleading."[134] Listing "NULL" in the "mod_trial" field was misleading because it indicated to Lynx that a loan was not subject to a trial modification.[135] Other fields included combinations of "NULLs" and information.[136] It would not have been apparent to Lynx, then, that the "mod_trial" field indicated an absence of information.

These breaches caused harm to Lynx. A loan's modification status affects loan pricing.[137] All else equal, loans in the process of modification are worth less than unmodified loans because they are more likely to reperform at a lower interest

---

[131] DelPonti Rep. 52.

[132] Agreement § 3.02(a).

[133] *Id.* at 75-76.

[134] *Id.* §§ 3.01(a)(x), 3.01(b)(ix).

[135] *See* DelPonti Tr. 721.

[136] *See id.*; *e.g.*, JX 93 at 40, 45, 48.

[137] *See* Said Tr. 393, 397-98; *see also* JX 263 at 1-2.

rate.[138]  The higher the incidence of modifications in progress, the less Lynx would have paid for the loan pools.[139]  That is because the longer a modification offer remains outstanding, the longer Lynx is exposed to the risk that interest rates will fluctuate.[140]  This risk was particularly acute during the historically volatile interest rate environment in late 2021.[141]

## ii.     *The Experts*

Lynx put forward the expert testimony of John DelPonti to estimate the number of loans with undisclosed modifications in progress. [142]  DelPonti has more than 35 years of experience in the mortgage banking industry.  He was the chief executive officer of a mortgage originator and servicer and the chief risk officer of a savings and loan association before transitioning to a consulting practice, where he specializes in mortgage banking.[143]

DelPonti conducted a loan-by-loan analysis to assess whether the MLSs Nationstar delivered to Lynx misstated or omitted facts about the condition of the

---

[138] *See* JX 774 ("Press Rep.") 18-22; *see also* Savchenko Dep. 113.

[139] Watts Tr. 32.

[140] Summers Tr. 454-55.

[141] *See* Pl. Lynx's Opening Post-trial Br. on Lynx's Claims ("Lynx's Opening Post-trial Br.") (Dkt. 322) 38.

[142] DelPonti Rep. 5.

[143] *Id*. at 8.

loans being sold.[144] His methodology involved five steps: (1) identifying the key documents in loan files; (2) identifying key servicing activities in Nationstar's electronic records; (3) comparing the loan file documents with electronic records to determine accuracy; (4) identifying Nationstar's comment codes and comments for loss mitigation activities; and (5) determining whether key comment codes were system-generated or free-form to ascertain their reliability for his purposes.[145] After confirming that he had identified comment codes (four-letter abbreviations indicating the type of servicing activity being recorded) and comments (descriptions of servicing activity) for relevant loss mitigation activities, DelPonti applied his technique to a sample of loans.[146] When his sampling proved effective, he extrapolated it to the entire population of 15,000 loans.

DelPonti compared the set of loans that were approved by Nationstar for interest rate modifications in Remedy, Nationstar's internal rate-setting program, against the MLS for each transaction.[147] He determined that, in the first transaction, Nationstar populated the "active_modification_flag" field with "0" for 16 loans that were in the process of being modified.[148] He also concluded that 1,578 loans in the

---

[144] *Id.* at 9.

[145] *See* DelPonti Tr. 709-11; Lynx's Trial Demonstrative 2 at 12; DelPonti Rep. 49.

[146] DelPonti Rep. 51.

[147] *Id.* at 50-51; DelPonti Tr. 723-25.

[148] DelPonti Rep. 50-51; JX 864.

28

second through seventh pools had undisclosed modifications progress, including 893 undisclosed trial modifications.[149] In total, he opined that of the loans he evaluated, 1,594 (or 12.41%) had undisclosed modifications in progress.[150]

Nationstar critiques DelPonti's methodology because he did not conduct an exhaustive review of the voluminous loan files. Doing so would have been a massively burdensome undertaking. The loan files are at least 1,000 pages per file.[151] The electronic servicing files average 1,862 records per mortgage loan, and over 25 million records for the 15,000 mortgage loans at issue.[152] But a full file review was unnecessary for DelPonti's purpose.[153] Only a small portion of the data in a loan file or servicing activity file relates to Nationstar's loss mitigation servicing practices during the relevant period.

---

[149] DelPonti Rep. 53, tbl. 14; DelPonti Tr. 820-21.

[150] *See* DelPonti Rep. 53, tbl. 14; JX 864.

[151] DelPonti Tr. 782.

[152] DelPonti Rep. 14.

[153] Nationstar's argument relies on a federal decision explaining that, under New York law, breach of contract claims must be proved on a "loan-by-loan" basis. Nationstar's Post-trial Answering Br. on Lynx's Claims and Opening Br. on Countercls. (Dkt. 325) ("Nationstar's Post-trial Answering Br.") 36 (quoting *BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Assoc.*, 247 F. Supp. 3d 377, 389-90 (S.D.N.Y. 2017)). But DelPonti did conduct a loan-by-loan analysis—one that relied on a relevant subset of available data for each loan. The cited decision provides no support for Nationstar's contention that, to prevail on a breach of contract claim, a plaintiff must review of every line in a loan file. It is also procedurally inapposite. There, the court evaluated breach of contract allegations at the pleading stage. *Id.* I am weighing evidence after trial.

Nationstar sought to rebut DelPonti's analysis through the expert testimony of Peter Ross. Ross managed mortgage servicing functions before forming a mortgage banking consulting firm.[154] Ross did a full-file review—but of only 15 to 20 loans. His sample was "not statistically random."[155] Ross admitted that the purpose of his review was "to find illustrations" to undercut DelPonti's conclusions.[156] New York law recognizes that extrapolations gleaned from a non-random sample are untrustworthy.[157] Ross's outcome-driven analysis is thin, and I give it little weight.

I accept DelPonti's approach and figures. DelPonti's data-driven methodology was reliable, thorough, and industry-appropriate.[158] He employed a loan-by-loan analysis that involved the review of 12,171,592 records.[159] He relied on essential data, used a sample to check his approach, performed a quality check,

---

[154] JX 793 ("Ross Rep.") 4.

[155] Ross Tr. 1419-20.

[156] *Id.* at 1419.

[157] *See, e.g.*, *Fed. Hous. Fin. Agency v. Nomura Hldg. Am., Inc.*, 104 F. Supp. 3d 441, 473 (S.D.N.Y. 2015) (concluding that it was "impossible to extrapolate to an entire pool the results from" non-random sample), *aff'd*, 873 F.3d 85 (2d Cir. 2017).

[158] *See Robinson v. Nationstar Mortg. LLC*, 2019 WL 4261696, *19 (D. Md. Sept. 9, 2019) (observing that an expert's analysis based on "a central computerized analysis of Nationstar data" using Nationstar's comment codes was an acceptable approach to prove violations of federal regulation).

[159] DelPonti Rep. 14.

and revised his conclusions to address minor flaws.[160]  Nationstar's data provided a responsible basis for him to do so.[161]

### b.      Inclusion of Loans with Modifications

Lynx contends that Nationstar also breached the Agreement by including loans with modifications in progress in the pools sold to Lynx.  Nothing in the Agreement required Nationstar to exclude loans with modifications in progress.  Lynx instead invokes Sections 3.01(a)(ix) and 3.01(b)(ix) of the Agreement, which concern the accuracy of any "statement . . . furnished" by Nationstar "in connection with the transactions."[162]

On October 28, 2021, Nationstar's Said emailed Lynx's Watts that Nationstar would "continue to remove pending mods" from Lynx's loan pools.[163]  Four days later, Nationstar confirmed to Watts that loans "[m]ods in-flight" would be excluded.[164]

---

[160] The flaws were identified by Nationstar's expert, which pointed out issues with 20 loan findings out of over 4,300 loans.  Despite the relatively minor nature of the critiques, DelPonti reexamined and corrected his findings.  DelPonti Tr. 868-39, 843-45.

[161] *See* Latman Tr. 1201-04 (Nationstar's employee testifying that he was "comfortable using data" from Nationstar's systems rather than "go[ing] through every loan file" to investigate why rates for Lynx loans were below prevailing market rates).

[162] Agreement §§ 3.01(a)(ix), (b)(x).

[163] JX 65 at 1; *see also* Watts Tr. 33.

[164] JX 87 at 4.

After the first sale transaction closed on November 16, Said told Watts that "[Nationstar] w[ould] remove all mods and mods in progress from the pool prior to [the] sale date" and "continue to remove [m]ods in progress."[165] Three months later, in February, Said wrote to Watts: "[W]e have 473 loans that have mods in progress (Docs out). 13 of them would be 2.5 coupon and we plan to remove[.]"[166] Watts interpreted "docs out" to mean the time "when the rate lock is set by Nationstar" and Nationstar sends "the modification document to the borrower."[167]

Lynx asserts that Said's statements about removing modifications in progress were false because such loans were included in sold pools. Setting aside whether Said's emails can be fairly read as statements "furnished in writing" under Section 3.01(a)(x) or 3.01(b)(ix) of the Agreement,[168] this small set of selective communications does not prove Lynx's claim.

A closer look at the record reveals that Lynx agreed to the inclusion of some modifications in progress in the loan pools. For example, in the same October 28

---

[165] *Id.* at 2; Watts Tr. 38-39.

[166] JX 154 at 1.

[167] Watts Tr. 45.

[168] Communicating through email did not necessarily relieve Nationstar of its obligation to provide truthful information. The Agreement expressly permits written notices to be sent by email. *See, e.g.*, Agreement §§ 4.02, 4.04(b), 4.05(d), 4.08, 12.06, 12.17. In the statute of frauds context, New York courts have held that email may satisfy the Uniform Commercial Code's definition of a writing. *See Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 378 F.Supp.2d 377, 383 (S.D.N.Y. July 18, 2005).

email Lynx cites, the parties agreed that Nationstar would remove loans with modifications in progress that were expected to be redelivered into a securitization.[169] But Watts instructed Said to "leave in" modifications in progress that were "2-4 months out" from redelivery, amounting to $100 worth of loans.[170]

For the second sale transaction, Watts asked Said to "exclude [m]ods-in-flight similar to what [Nationstar] did" on the first pool—where Watts had asked Said to include certain modifications in progress.[171] Lynx also accepted loans with modifications in progress for the February 2022 sale. When Lynx asked about the rates at which loans were being modified, Said volunteered that "473 loans . . . ha[d] mods in progress ([d]ocs out)."[172] Watts responded: "We are good to keep the [m]ods in progress in the closing population."[173]

Given these contradictions in the record, Lynx did not prove that Nationstar promised to remove the same loans with modifications in progress that were included in the pools. Lynx focuses on isolated statements in transaction-specific

---

[169] JX 65 at 1.

[170] *Id.*; *see also* Said Tr. 314 (testifying that he understood Lynx made this distinction because loans that were expected to be redelivered imminently did not have enough "upside potential" for Lynx, as it "may not be able to receive principal and interest on those loans for a long enough period of time").

[171] *See* JX 87 at 4; Said Tr. 317-19.

[172] JX 154 at 1.

[173] *Id.*

emails. Lynx cannot use these snippets to obtain protections it did not bargain for in the Agreement.

### 2. Nationstar's Alleged Breaches Related to Servicing of Loans

Lynx also claims that Nationstar breached the Agreement post-closing in its capacity as seller. It raises four categories of alleged breaches regarding: (1) modifying interest rates below prevailing market rates; (2) actions taken slower than applicable guidelines or industry standards require; (3) the accuracy and completeness of mortgage loan report data; and (4) Nationstar's facilities, procedures, and personnel. Lynx has met its burden of proof for a subset of the second category.

### a. Rate-Setting Practices

Lynx asserts that Nationstar breached the Agreement by modifying loans below the Prime Mortgage Market Survey (PMMS) rate.[174] PMMS is an aggregate weekly survey of mortgage interest rates in the United States issued by the Federal Home Loan Mortgage Corporation (Freddie Mac).[175] PMMS is considered the market rate, and modifications are often made at or above it.[176]

---

[174] Lynx's Opening Post-trial Br. 24-31.

[175] PTO ¶ 50.

[176] *See* DelPonti Tr. 733; DelPonti Rep. 63-65.

After closing, Nationstar modified certain loans sold to Lynx using a "brand rate" that was below PMMS.[177] A brand rate is a modified interest rate applied across an investor's or owner's loans that is different from the maximum allowable interest rate set by agency guidelines.[178] The brand rate Nationstar applied to Lynx's loans was lower than the default rate programmed into Remedy for other Nationstar clients.[179]

Nothing in the Agreement obligated Nationstar to modify interest rates at or above PMMS. Yet according to Lynx, Nationstar's sub-PMMS rate modifications breached the Agreement in two ways. First, Lynx argues that the rates applied were inconsistent with "Customary Servicing Procedures" in breach of Section 4.01(a) of the Agreement.[180] Second, Lynx argues that emails about rate setting practices were inaccurate "statements . . . furnished in writing," which breached Sections 3.01(a)(x) and 3.01(b)(ix) of the Agreement.[181] Neither theory succeeds.

---

[177] Cherry Tr. 601, 645-46.

[178] *Id.*

[179] Remedy can be programmed to include investor-specific guidelines and modification terms. Cherry Tr. 592. Certain Nationstar clients requested rates different from the brand rate. Lynx did not. Meacham Tr. 996-97. There is no obligation in the Agreement that Nationstar affirmatively offer Lynx a lower rate. Nor is there any provision of the Agreement or industry standard prohibiting Nationstar from overriding the default rate programmed into Remedy to effect downward adjustments below PMMS. *See* DelPonti Tr. 745.

[180] Agreement § 4.01(a); *see supra* note 46 and accompanying text (quoting the provision).

[181] Agreement §§ 3.01(a)(x), 3.01(b)(ix); *see supra* notes 39, 45 and accompanying text (quoting the provisions in full).

### i. *Customary Servicing Procedures*

There is no specific industry standard requiring mortgage loan interest rates to be set at or above PMMS.[182] Lynx relies on DelPonti's testimony and a single publication to formulate one. DelPonti testified that, in his opinion, the industry standard is to modify interest rates "at or above market rate . . . [i.e., the] PMMS rate," subject to the applicable government program maximums.[183] And a paper prepared by the Mortgage Servicing Collaborative—a research initiative of "key industry stakeholders"—states that "[t]he interest rate on an FHA, VA, or [United States Department of Agriculture (USDA)] loan is generally reset to the prevailing market rate at the time of modification, even if it results in a rate increase for the borrower."[184]

Regulatory guidance is far more flexible, however. It generally treats PMMS as a ceiling—not a floor.[185] DelPonti admitted that under VA and USDA forbearance programs, the modified interest rate "would be required to be below PMMS" for borrowers whose existing rates were over 1% below the PMMS rate at

---

[182] DelPonti Tr. 829; Ross Tr. 1307.

[183] DelPonti Tr. 733; DelPonti Rep. 63-65.

[184] JX 2 at 3; *see id.* at 2 (listing participants in the publication to include Nationstar representatives and one of Nationstar's experts in this case).

[185] *See* JX 834 (chart summarizing relevant agency guidelines setting maximums, not minimums, for modified interest rates); Latman Tr. 1163; Ross Tr. 1306; Cherry Tr. 598; *see also* Schiffer Tr. 211, 213; DelPonti Tr. 828-29.

the time of modification.[186]  The VA's guidance permits servicers to "offer an interest rate below the maximum allowable rate at their discretion."[187]  The USDA's guidance similarly states that "[l]oan modifications may include a change in the interest rate, even below the market rate if necessary and should focus on payment reduction as a primary goal."[188]

Without a firm standard requiring modified rates to meet or exceed PMMS, Lynx's claim under Section 4.02(a) of the Agreement fails.

        ii.       *Emails About Rates*

Before closing, Nationstar made statements to Lynx about rates it would use for loan modifications in the future when servicing the loans.[189]  The discussed rates were at or above PMMS.  For example, on October 20, 2021, when PMMS was 3.05%, Nationstar's Said reported to Lynx's Watts that VA loans were being modified to 3.25%.[190]  On November 16, 2021, Said told Watts that Nationstar had modified VA loans to "PMMS plus 25 [basis points]."[191]  And on March 14, 2022,

---

[186] DelPonti Tr. 828-29.

[187] JX 32 at 4; *see* DelPonti Tr. 829-30.

[188] JX 1178 at 341; *see* DelPonti Tr. 830.

[189] *E.g.*, JX 87 at 1, 5; JX 210 at 1; Watts Tr. 84-85; JX 743 at 1.

[190] JX 87 at 5-6; *see also* JX 743 at 1.

[191] JX 87 at 1-2.

Said wrote to Watts that the rate was "PMMS flat for FHA" and "PMMS +25 for VAs."[192]

None of Said's emails represented that Nationstar would set modified interest rates at or above PMMS. Instead, Said was confirming the modified interest rate he believed applied to certain loan categories at specific times.[193] His comments did not address Nationstar's rate-setting methods broadly or make promises about future practices. Like Lynx's claim based on pre-closing statements about modifications in progress, this attempt to construe individual lines in emails as sweeping misrepresentations falls short.

b.     Servicing Timelines

Lynx maintains that Nationstar took too long to modify and redeliver loans, in violation of regulatory guidance and industry standards.[194] The FHA, VA, and USDA each have different rules for appropriate servicing timelines.[195]

Lynx claims that Nationstar violated these guidelines by failing to: (1) complete loss mitigation solutions within 120 days of borrowers exiting forbearance; (2) complete loss mitigation solutions within 120 days of approval; and (3) redeliver eligible mortgage loans into securitizations within 30 days of

---

[192] JX 210 at 1; Watts Tr. 84-85.

[193] JX 87 at 1.

[194] Lynx's Opening Post-trial Br. 31-37.

[195] *See* Summers Tr. 442.

modification. In Lynx's view, these delays violated "Applicable Requirements and Customary Servicing Procedures"—and thus Section 4.01(a) of the Agreement.[196] Lynx proved that its first theory constitutes a breach of the Agreement, but not its second or third.

          i.        *Loss Mitigation Completion Within 120 Days of Forbearance Exit*

Nationstar had to service the loans Lynx purchased in accordance with "Applicable Requirements and Customary Servicing Procedures."[197] "Applicable Requirements" include federal agency guidelines that mandate timelines to complete modification solutions.[198]

In 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act. The statute allowed borrowers with federally backed mortgages to request a forbearance of their mortgage payments because of hardships caused by the COVID-19 pandemic.[199] The FHA and VA issued guidelines requiring mortgage loan servicers to complete loss mitigation solutions within 120 days of loans exiting the forbearance period.[200] The FHA mandated that "[t]he Mortgagee must complete

---

[196] Agreement § 4.01(a); *see supra* note 46 and accompanying text (quoting provision in full).

[197] *Id.* § 4.01(a).

[198] *Id.* § 1.01.

[199] *See* DelPonti Tr. 733-34; 15 U.S.C. § 9056.

[200] JX 34 (FHA); JX 32 (VA).

a loss mitigation option . . . no later than 120 Days from the earlier of the date of completion or expiration of the forbearance."[201] The VA mandated that "[a]ll loan documents are to be fully executed not later than 120 days after the borrower exits the COVID-19 forbearance."[202] There is no dispute that these agency guidelines applied to certain loans Nationstar sold to Lynx.[203]

Nationstar violated these guidelines when it failed to complete loss mitigation within 120 days of loans exiting forbearances. In doing so, Nationstar violated its representation and warranty in Section 4.01(a) of the Agreement.

To assess the scope of this breach, DelPonti compared the date on which the borrower exited forbearance to the date on which the workout was completed.[204] He identified 1,369 mortgage loans for which Nationstar failed to complete a loss mitigation option within 120 days of exiting forbearance.[205] His findings comport with an audit of the U.S. Department of Housing and Urban Development's (HUD) Office of Inspector General, which found that "Nationstar did not provide proper

---

[201] JX 34 at 11.

[202] JX 32 at 5.

[203] *E.g.*, JX 2130 at 2 (Nationstar recognizing that "FHA guidance states we must complete workout within 120 days of forbearance ending . . . .").

[204] DelPonti Rep. 54-55.

[205] DelPonti Tr. 757; DelPonti Rep. 56, tbl. 15.

loss mitigation assistance to more than 80 percent of borrowers with delinquent FHA-insured loans after their COVID-19 forbearance ended."[206]

Nationstar argues that its failure to comply with this 120-day timeline breach the Agreement because delays could have been caused by borrowers.[207] But in cases where borrowers are dilatory in returning loan documents, guidelines permit servicers to request extensions for HUD approval.[208] Nationstar did not file any extension requests. Its internal Remedy system was never programed to alert Nationstar to the 120-day timeline.[209] Nor was the head of Nationstar's modification group aware that the 120-day timeline applied to modifications.[210] HUD's denial of a Nationstar request that HUD "expressly remove the 120-day timeline requirement or else make that metric a suggestion and not a requirement" further demonstrates that the 120-day timeline was mandatory.[211]

---

[206] JX 722 at 3.

[207] Nationstar's Post-trial Answering Br. 51-54.

[208] JX 722 at 29.

[209] *See* Ross Tr. 1387-88 (confirming that Nationstar did not implement the 120-day rule); Latman Tr. 1193-94 (testifying that Nationstar did not program the 120-day rule into Remedy).

[210] JX 2130 at 2.

[211] *See* JX 696 at 1, 3.

ii. *Loss Mitigation Completion Within 120 Days of Approval*

Lynx also asserts that Nationstar breached Section 4.01(a) of the Agreement by failing to complete loss mitigation within 120 days of approval.[212] Unlike mitigation after forbearance, Lynx cites no agency guideline setting out this timeframe. Its argument rests only on DelPonti's opinions on industry standards.[213]

Lynx did not prove that any customary loan servicing procedure imposes a rigid 120-day timeline to complete loss mitigation after approval.[214] Loss mitigation solutions are case-specific and can take longer than 120 days from approval.[215] The process is a bilateral one contingent upon borrower responsiveness. A borrower may stop communicating with the servicer or fail to timely return documents, which would delay the booking of a solution.[216] DelPonti acknowledged that he did not account for borrower delays falling outside of Nationstar's control.[217]

Further, DelPonti conceded that a forbearance exit "generally occurs before approval" of a modification.[218] Given that, Lynx's claimed industry standard

---

[212] Lynx's Opening Post-trial Br. 34-35.

[213] *See* DelPonti Tr. 759-60; DelPonti Rep. 57.

[214] DelPonti Tr. 806.

[215] Ross Tr. 1322-24.

[216] *Id.* 1325-26.

[217] DelPonti Tr. 807-08.

[218] DelPonti Rep. 57.

timeline is inconsistent the agency guidelines discussed above because the 120-day

clock would restart once a servicer approved a modification.

<em>iii.</em>     <em>Redelivery Within 30 Days of Modification</em>

Lynx next contends that Nationstar violated an industry standard requiring the

redelivery of loans into GNMA pools within 30 days of completing modifications.[219]

Neither the Agreement nor GNMA guidance imposes a thirty-day deadline.[220]  To

be eligible for re-pooling, GNMA requires that "the permanently modified

loan . . . be current as of the issuance date of the related security."[221]  GNMA's

guidance poses a hypothetical in which the modification-to-redelivery timeline

could span multiple months:

> As of the pooling date, no more than one (1) monthly payment
> on the pooled mortgages can be due and unpaid.  For example, if
> the pooling date of a January 1 single family security is
> December 28, then in order to be eligible for pooling, the
> November payment on the loan must have been paid, and the
> only payment that may be due is the December payment.[222]

The Agreement requires only that Nationstar "use commercially reasonable

efforts in good faith" to redeliver reperforming loans to GNMA pools.[223]  The

---

[219] Lynx's Opening Post-trial Br. 35-37.

[220] *See* Agreement § 4.04(b).

[221] JX 911 at 2.

[222] *Id.*

[223] Agreement § 4.04(b).

provision lacks a time element.[224]  Factoring in the steps between modification and redelivery, Lynx's purported 30-day timeline falls apart.  Much of the period could elapse before Nationstar identified and approved loans for repurchase and redelivery, which occurred at the beginning of each month.[225]

Even if there were a standard 30-day timeline to redeliver a loan into a GNMA securitization after completing a modification, Lynx's claim would fail.  The timing of redelivery hinges on Lynx's acceptance of Nationstar's repurchase—not Nationstar's completion of a modification.[226]  Section 4.04(b) of the Agreement provides that Lynx's repurchases must "be effectuated . . . not later than the first GNMA pooling date immediately following the date on which [Nationstar] received the related Reperforming Mortgage Loan Repurchase Notice[.]"[227]  That is, if Lynx was slow in deciding whether to accept a repurchase offer, the 30-day timeline would be frustrated.  Nationstar alone should not bear the responsibility for these delays.

---

[224] *Id.*

[225] Ross Tr. 1318, 1321.

[226] Agreement § 4.04(b); *see also* DelPonti Tr. 810-11 (confirming that it is Lynx's acceptance of a repurchase offer that triggers the redelivery timeline).

[227] Agreement § 4.04(b).

### c. Completeness and Accuracy of MLRs

The next category of breach claimed by Lynx concerns modification pipeline information Nationstar provided Lynx after closing. In January 2022, Lynx requested "mod rate lock" reports (MLRs) from Nationstar.[228] MLRs are daily reports about loans in Lynx's portfolio.[229] This request was to optimize the hedging strategies of Lynx's affiliate, non-party Nomura.[230] Lynx and its affiliate wanted to know the post-modification rates and rate lock dates to better hedge the interest rates associated with the loans.[231]

Nationstar initially supplied a "completed Mod Rate Lock report" that would be run "daily."[232] Lynx perceived various inaccuracies in these MLRs.[233] It asserts that the reports violated Nationstar's promise in Section 3.01(b)(ix) of the Agreement to provide complete and accurate "statement[s], report[s] or other document[s] furnished or to be furnished in writing by or on behalf of the Servicer pursuant to th[e] Agreement or in connection with the transactions[.]"[234]

But the Agreement's purpose was "to prescribe the manner of purchase by

---

[228] *See* JX 119 at 1; JX 127 at 3-4.

[229] Schiffer Tr. 174.

[230] *Id.* at 204-05.

[231] *See* Lee Dep. 77-78, 81; JX 773 ("Johannes Rep.") 54-55.

[232] JX 132 at 3.

[233] *See* Johannes Rep. 44-46; *see also* JX 132 at 1; JX 294 at 1.

[234] Agreement § 3.01(b)(ix); *see* Lynx's Opening Post-trial Br. 74-76.

[Lynx] and the management, servicing and control of the Mortgage Loans."[235] There is no mention of optimizing Lynx's hedging strategy. Nor did the Agreement contemplate data reporting to facilitate Lynx's hedging strategy—much less the hedging strategy of a third party.[236] The MLRs, then, were not documents "furnished . . . pursuant to th[e] Agreement or in connection with the transactions [it] contemplated[.]"[237] The fact that Nationstar accommodated Lynx's request for MLRs does not tie the reports to the Agreement or underlying loan sales, as Section 3.01(b)(ix) of the Agreement requires.

### d. Resources Necessary for Sound Servicing

Nationstar confirmed in Section 3.01(b)(v) of the Agreement that it had the "facilities, procedures, and experienced personnel necessary for the sound servicing of mortgage loans[.]"[238] Lynx contends that Nationstar breached this representation because it "lacked key policies and procedures" and the "experienced personnel necessary for sound servicing of Lynx's loans."[239] This argument amounts to a critique of Nationstar's practices—not a legitimate breach of contract claim.

---

[235] Agreement 5.

[236] *See id.* § 7.01 (outlining Nationstar's reporting obligations as seller and servicer).

[237] *Id.* § 3.01(b)(ix).

[238] *Id.* § 3.01(b)(v).

[239] Lynx's Opening Post-trial Br. 76-77.

Nationstar is the largest loan servicer in the country (including subservicing) and the fourth largest servicer in terms of MSRs owned.[240]  It is a top-rated servicer, ranked Tier 1 (Grade A) by HUD.[241]  Fitch Ratings has commended Nationstar for its "high performance in overall servicing ability" and "experienced senior management and staff."[242]

Nationstar maintained extensive written policies and procedures governing loan servicing, including "hundreds" of policies and procedures addressing loss mitigation.[243]  It has defined policies and procedures for setting interest rates—a process involving a collaborative effort among various business groups to incorporate federal guidance into Nationstar's automated systems.[244]

Lynx primarily focuses on purported deficiencies in Nationstar's override practices.[245]  An override is a manual process by which a Nationstar employee rejects an interest rate supplied by Remedy for a loan modification and applies a different (often lower) rate.[246]  Nationstar had no formal policies or procedures governing

---

[240] *See* Said Tr. 296-97; Ross Tr. 1289; Latman Tr. 1139.

[241] JX 1824 at 3.

[242] JX 1655 at 24; JX 1541 at 1.

[243] Latman Tr. 1141-42, 1152-53.

[244] McDow Tr. 1223-25; *see supra* note 179 and accompanying text.

[245] Lynx's Opening Post-trial Br. 28-31, 77.

[246] Cherry Tr. 628.

overrides.[247] But overrides are ubiquitous throughout the loan servicing industry.[248] And Nationstar maintained controls to ensure that overrides applied in limited circumstances by personnel with the authority to approve them.[249]

Lynx fares no better in challenging the experience of Nationstar's servicing personnel. It seizes on perceived buck-passing by Nationstar employees who disclaimed knowledge of or involvement in the day-to-day of processing loss mitigation workouts or loan modifications. Lynx itself commissioned two third-party firms to rate Nationstar's servicing capabilities, both of which praised the strength of Nationstar's procedures and senior management.[250] Although trial revealed knowledge gaps,[251] Lynx did not prove that Nationstar lacked the personnel needed for sound servicing.

### 3. Nationstar's Alleged Breaches Post-Termination

Lynx asserts that Nationstar breached the Agreement after its termination as servicer.[252] These claimed breaches take three forms: (1) initially refusing to step down as servicer; (2) refusing to pay the Servicing Rights Value; and (3)

---

[247] *See* Cherry Tr. 631-62; *see also* Ross Tr. 1398-99.

[248] *See* Ross Tr. 1310-11; Ross Rep. 65-66; DelPonti Tr. 745.

[249] Latman Tr. 1174; Ross Rep. 65.

[250] JX 891 at 20; JX 1560 at 3.

[251] *E.g.*, Hassan Tr. 506-7, 510, 574; Richardson Tr. 568-76; JX 506.

[252] *See* Lynx's Opening Post-trial Br. 78.

misappropriating funds from the escrow account. The second and third theories are the inverse of Nationstar's counterclaims, which I take up further below.[253]

As to the first theory, Lynx invoked its right to terminate Nationstar as servicer on December 13, 2022.[254] This right is provided by Section 9.01 of the Agreement, which specifies various "Events of Default" by Nationstar as servicer that merit termination.[255] An event of default occurs if:

> [A]ny statement, certification, representation or warranty made by [Nationstar] [in the Agreement] or in any statement or certificate furnished by or on behalf of [Nationstar] in connection with th[e] Agreement, is untrue in any material respect or contains any misstatement of fact as of the date of the issuance or making thereof.[256]

Nationstar refused to step down when Lynx terminated it, triggering expedited litigation.[257] Nationstar only resigned as servicer after litigation was filed and a motion to expedite hearing was set.[258] Its initial refusal breached Section 9.01 insofar as Lynx cited valid events of default.[259]

---

[253] *See infra* Section II.B.

[254] JX 591 at 6-7.

[255] Agreement § 9.01.

[256] *Id.* § 9.01(c).

[257] *See* Dkt. 1; *see also* Watts Tr. 103-04.

[258] *See* Dkt. 8.

[259] Lynx proved certain breaches of the Agreement in Nationstar's capacity as servicer, as discussed above. *See supra* Sections II.A.1.a.i, II.B.1, II.B.2.b.

Lynx seeks its attorneys' fees and costs of bringing this litigation to carry out the transfer to Servbank. This request is derivative of Lynx's separate demand for attorneys' fees under a prevailing party provision. My resolution of this relief awaits Lynx's fee petition, which it has requested leave to file.[260]

## B. Lynx's Claims and Nationstar's Counterclaims Regarding Servicing Rights and Advances

As noted above, Lynx claims that Nationstar breached the Agreement after its termination as servicer by refusing to pay the Servicing Rights Value.[261] Nationstar counterclaims that Lynx breached the Agreement by failing to procure and pay a fair market valuation of the same MSRs.[262]

Nationstar also counterclaims that Lynx and Servbank failed to reimburse unpaid servicing advances after the transfer.[263] This theory relates to Lynx's claim that Nationstar breached the Agreement by taking funds from the servicing escrow account instead of transferring them to Servbank.[264]

---

[260] *See infra* Section IV.

[261] *See* Lynx's Opening Post-trial Br. 78-80.

[262] *See* Nationstar's Post-trial Answering Br. 89-99. Alternatively, Nationstar asserts that Lynx's actions breached the implied covenant of good faith and fair dealing. *See id.* at 104-06.

[263] *See id.* at 99-104.

[264] *See* Lynx's Opening Post-trial Br. 81-84.

I resolve the valuation dispute in favor of Lynx. As to the escrow funds and unpaid servicing advances, both parties' positions have merit. I address how relief will be apportioned for those claims in the remedies section that follows.[265]

### 1. Refusal to Pay Servicing Rights Value

Under Section 10.02 of the Agreement, Nationstar's termination as servicer and transfer of the associated MSRs required Lynx to engage a "nationally recognized" third party "Servicing Rights Valuation Provider."[266] The Servicing Rights Valuation Provider is authorized to determine the "Servicing Rights Value," which is defined as the "aggregate fair market value" of the MSRs.[267] After Lynx raised concerns that Nationstar had tainted the original Servicing Rights Valuation Provider (Situs), the parties agreed that MIAC would become the Servicing Rights Valuation Provider.[268] MIAC accepted the engagement.[269]

#### a. MIAC's Expertise

MIAC is a nationally recognized provider of MSR valuations.[270] It issues MSR valuations related to tens of trillions of dollars' worth of unpaid principal

---

[265] *See infra* Section III.B.

[266] Agreement § 10.02; *see supra* Section I.F.

[267] Agreement § 10.02.

[268] PTO ¶ 73; JX 636 at 5; Said Tr. 371-72; Watts Tr. 109-10; *see supra* notes 73-77 and accompanying text.

[269] JX 661 at 18.

[270] Said Dep. 321.

balance.[271]  MIAC continually updates its loan performance model based on its insight into the performance of millions of mortgage loans.[272]  Nationstar's valuation expert, John Britti, admitted that MIAC's discounted cash flow model was "standard in the industry."[273]  Nationstar itself licenses MIAC's model to value Nationstar's MSR portfolio.[274]

The MIAC team performing the valuation was led by Michael Carnes, the Managing Director of MIAC's MSR Valuation and Brokerage Group.[275]  He has spent nearly three decades valuing MSRs.[276]  He is involved with approximately 1,000 MSR valuations per year.[277]  He is also the author of the chapter "What is an MSR" in *The Mortgage Professional's Handbook, Volume III*.[278]

b.  The Valuation

The valuation process involved input from Nationstar's Said and Lynx's Watts.  At the outset, Said told MIAC that he did not think Lynx's subservicing costs

---

[271] Carnes Tr. 911.

[272] *Id.* at 974 (testifying that MIAC "see[s] virtually every MSR in the entire country" which "has enabled [it] to build tools that [it is] very, very proud of and very, very confident in").

[273] Britti Tr. 1439.

[274] Said Dep. 324.

[275] Carnes Tr. 912; PTO ¶ 32.

[276] Carnes Tr. 912-14.

[277] *Id.* at 914.

[278] *Id.* at 914-15.

should be considered in a fair market valuation.[279] MIAC agreed to exclude them. During the process, Said noted that MIAC's model assumed loans remained in GNMA securities based on a tag in the original data tape and asked MIAC to re-run the valuation with the contrary assumption to exclude advances of delinquent principal and interest.[280] MIAC took Said's instruction and adjusted its valuation by removing certain principal and interest advances.[281]

On March 22, 2023, MIAC delivered a valuation for the MSRs of negative $23.6 million in fair market value.[282] Carnes endorsed this valuation as the product of his and MIAC's "best expert judgment."[283]

Under Section 10.02(2) of the Agreement, a negative value required Nationstar to, "within ten (10) business days after [its] receipt of the Servicing Rights Valuation, pay [Lynx]" the sum.[284] Nationstar has refused to do so.

---

[279] Said Dep. 381-84, 386; JX 625 at 1; *see also* JX 635 at 1.

[280] JX 661 at 1.

[281] *Id.*

[282] *See* JX 662; Carnes Tr. 968; *see also* Watts Tr. 112-14.

[283] Carnes Tr. 961.

[284] Agreement § 10.02(2) ("If the Servicing Rights Valuation states that the Servicing Rights Value of the Servicing Rights related to all Bifurcated Mortgage Loans is equal to or less than zero dollars ($0.00), then (a) [Nationstar] shall, within ten (10) Business Days after [Nationstar's] receipt of the Servicing Rights Valuation, pay to [Lynx] the sum of (i) the absolute value of the Servicing Rights Value of the Servicing Rights related to all Bifurcated Mortgage Loans, plus (ii) all amounts that are due and payable by [Nationstar] to [Lynx] pursuant to this Agreement . . . .").

### c. Nationstar's Challenge

The Agreement lacks a dispute resolution mechanism for the Servicing Rights Valuation. It does not contemplate substantive judicial review. It says only that the sum "shall" be paid within ten days of receipt of the valuation.[285] Under New York law, an agreement that a valuation will occur "within . . . contractual limits . . . is 'entitled to every reasonable intendment and presumption of validity.'"[286]

New York law permits a party to challenge a contractually mandated valuation only for "fraud, bias, or bad faith on the part of the neutral appraiser."[287] There is no evidence of fraud, bias, or bad faith by MIAC. Carnes confirmed that the valuation was not swayed by Nationstar or Lynx.[288] Said testified that he has no reason to believe MIAC acted unethically, was biased towards Lynx, intentionally

---

[285] *Id.* §§ 10.02(1), (2).

[286] *Coral Crystal, LLC v. Fed. Ins. Co.*, 2020 WL 5350306, at *5 (S.D.N.Y. Sept. 3, 2020) (quoting *Glicksman v. N. River Ins. Co.*, 86 A.D.2d 760, 760 (N.Y. App. Div. 1982)). Delaware law similarly provides that courts will not second-guess an expert valuation where the contract "did not provide for any substantive judicial review at all." *Senior Hous. Cap., LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012, at *3 (Del. Ch. May 13, 2013).

[287] *101 W. 23 Owner I LLC v. 715-723 Sixth Ave. Owners Corp.*, 174 A.D.3d 447, 448 (N.Y. App. Div. 2019) (citation omitted); *see also Certain Underwriters at Lloyd's London v. Bioenergy Dev. Grp. LLC*, 189 A.D.3d 573, 574 (N.Y. App. Div. 2020) ("Because the award was made pursuant to the procedures set forth in the parties' agreement and they do not claim fraud, bias, or bad faith, [it] should not be disturbed."); *Johnson Kirchner Hldgs, LLC v. Galvano*, 150 A.D.3d 1001, 1002 (N.Y. App. Div. 2017) ("[A]n appraisal will not be set aside absent proof of fraud, bias, or bad faith."); *Rice v. Ritz Assocs., Inc.*, 88 A.D.2d 513, 514 (N.Y. App. Div. 1982) (applying a fraud, bias, or bad faith standard).

[288] *See* JX 661 at 1; Carnes Tr. 960-61; Carnes Dep. 360-61.

54

reached an erroneous conclusion, or was subject to undue pressure.[289] Although Said feels that the valuation results indicate MIAC relied on inaccurate data, he cannot cite any specific inaccuracy.[290]

Nationstar argues instead that the valuation should be set aside due to a "palpable mistake."[291] Some New York courts have observed that a "determination by a designated third party" can be challenged where there is evidence of "fraud, bad faith, or palpable mistake by the third party."[292] This "palpable mistake" standard is against the weight of the majority of modern New York valuation cases, however, which generally cite a "fraud, bias, or bad faith" standard.[293]

Even if "palpable mistake" were the operative standard, Nationstar's challenge would fail. New York courts have described a palpable mistake as one where the appraiser failed to perform a valuation called as defined by the contract.[294]

---

[289] Said Dep. 365-67.

[290] *Id.* at 392-93.

[291] Nationstar's Post-trial Answering Br. 89.

[292] *See Lear Siegler Aerospace Prods. Holding Corp. v. Smiths Indus., Inc.*, 1990 WL 422417, at *5 (S.D.N.Y. Mar. 16, 1990); *Schwartzberg v. Kingsbridge Heights Care Ctr.*, 28 A.D.3d 463, 465 (N.Y. App. Div. 2006).

[293] *Certain Underwriters at Lloyd's*, 189 A.D.3d at 574; *see supra* note 287 (listing cases).

[294] *See Lear Siegler*, 1990 WL 422417, at *5 (denying summary judgment because triable fact issue existed as to whether third party's "accounting techniques … deviate[d] from the procedures set forth in the Agreement"); *Cities Serv. Co. v. Derby & Co.*, 654 F. Supp. 492, 500-01 (S.D.N.Y. 1987) (recognizing that independent expert determinations should be set aside when "customary practice or procedure is not followed when making the determination or certification" or for "failure of [the] independent third party to follow the

But MIAC exercised its expert judgment and rendered a fair market valuation in accordance with the Agreement.

Nationstar points out that MIAC initially misapprehended that the loans at issue were in GNMA securities.[295] MIAC acknowledged and corrected for this mistake—the result of an isolated error in the underlying loan tape—after Nationstar flagged it.[296] Even so, MIAC understood that it was valuing the servicing rights of EBO loans that are—by definition—loans bought out of a GNMA securitization.[297] Carnes exercised his judgment to address the issue Nationstar raised, which caused the valuation to change from approximately negative $30 million to the final negative $23.6 million value.[298]

Nationstar, relying on Britti's expert opinion, insists that MIAC's correction of its mistaken assumption was incomplete. Britti highlights purported valuation

---

standards or procedures prescribed in the contract,"), *aff'd*, 835 F.2d 1429 (2d Cir. 1987); *Turner v. N.Y. Cent. & H.R.R. Co.*, 168 A.D. 359, 365 (N.Y. App. Div. 1915).

[295] *See* Carnes Tr. 923; Carnes Dep. 282-84; Watts Tr. 148; Britti Tr. 1443 (discussing JX 3006, the data tape provided to MIAC by Watts, which "MIAC would have read [] to indicate that the loans were in a [GNMA] pool and were not EBO loans"); *see also* Nationstar's Post-trial Answering Br. 91.

[296] JX 661 at 1-2 (discussing "a line item expense for interest on principal and interest advances totaling over $7M" which Carnes confirms is due to the fact that "the data was reported to MIAC with GNMA II investor"); Carnes Tr. 976.

[297] Carnes Tr. 919 ("As a rule, once a loan gets bought out of its pool, which these were, the MSR ceases to exist at that point in time."); *id.* at 946 ("The fact that . . . all of these assets were EBOs would imply that they've all obviously been seriously delinquent."); *see also* JX 661 at 18-19; Press Rep. 17.

[298] Carnes Tr. 977-78.

errors related to MIAC's treatment of foreclosure costs, which are greater for loans in a GNMA pool.[299] According to Britti, MIAC improperly included "FHA Lost Interest" (the difference between the mortgage interest rate the servicer advances and the amount reimbursed to the servicer), which he opined should be excluded from a valuation of EBO loans.[300] Correcting for the consequences of this purported error would yield a valuation of positive $10.5 million, according to Britti.[301]

Britti's critique—even if legitimate—amounts to a mere disagreement with MIAC's exercise of its expert judgment. MIAC provided a sensible rationale for its approach.[302] Purchasers of EBO loans are likely to redeliver the assets into a GNMA pool and incur the same advance and foreclosure costs in the future.[303] EBO loans are associated with delinquent borrowers who carry "a significantly higher probability of default than . . . a borrower that had never been delinquent before."[304] Carnes characterized Lynx's EBO portfolio as "one of the most toxic portfolios [he had] ever valued in [his] life."[305] It was not a "palpable error" for MIAC to incorporate assumptions consistent with loans in GNMA pools in its valuation.

---

[299] *See* Britti Tr. 1460-70.

[300] JX 779 ("Britti Rep.") 42; *see* Britti Tr. 1469-70; *see also* JX 661 at 3-4.

[301] Britti Tr. 1471, 1424-25.

[302] Carnes Tr. 973-74.

[303] *Id.* at 979-80.

[304] *Id.* at 955-56.

[305] *Id.* at 987.

Carnes persuasively and steadfastly denied any error in MIAC's modeling.[306] Even if there were an error, Nationstar has not proved that it supports overturning MIAC's valuation.[307] Nationstar did not bargain for a dispute resolution process that would allow it to revisit the valuation on that basis. Thus, Lynx has prevailed on its breach of contract claim; Nationstar's related counterclaim fails.[308] Nationstar must pay to Lynx $23.6 million under Section 10.02 of the Agreement.

### 2. Escrow Funds Post-Termination

The parties' final dispute concerns funds that Nationstar retained for unreimbursed servicing advances.

When Nationstar was terminated as servicer, it needed to transfer the MSRs to Servbank. Section 12.01 of the Agreement, titled "Successor to the Servicer," provides:

> [Nationstar] shall promptly (but not later than five (5) Business Days after appointment of such successor) deliver to the successor the funds in the funds in the Custodial Account, and the Escrow Account . . . . The successor [Servbank] shall make arrangements as it may deem appropriate to reimburse [Nationstar] for amounts [Nationstar] actually expended pursuant to th[e] Agreement which the successor is entitled to retain hereunder and which would otherwise have been

---

[306] Carnes Dep. 341.

[307] *See Penn Cent. Corp. v. Consol. Rail Corp.*, 56 N.Y.2d 120, 130 (1982) (explaining that under New York's approach to appraisals, "factual errors do not ordinarily affect the validity of an award").

[308] *E.g.*, *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2009 WL 3756700, at *5 (Del. Ch. Nov. 9, 2009).

recovered by [Nationstar] pursuant to th[e] Agreement but for the appointment of the successor servicer.[309]

The "Escrow Account" is defined as "the separate trust account or accounts created and maintained by [Nationstar] pursuant to Section 4.08."[310] Section 4.08 of the Agreement, in turn, states that: "[Nationstar] shall segregate and hold all funds collected and received pursuant to each Mortgage Loan which constitute Escrow Payments separate and apart from any of its own funds and general assets and shall establish and maintain one or more Escrow Account."[311]

Accordingly, the Agreement obligated Nationstar to deliver the funds in the escrow account to Servbank within five days of Servbank's appointment as successor servicer. Servbank was expected to arrange to reimburse Nationstar for the servicing advances it "actually expended," in a manner Servbank deemed appropriate.[312] Nationstar paid approximately $53.9 million of servicing advances on Lynx's behalf, with the expectation that it would be repaid.[313] But Servbank (until trial) made no reimbursement arrangement.[314]

---

[309] Agreement § 12.01.

[310] *Id.* § 1.01.

[311] *Id.* § 4.08.

[312] *Id.* § 12.01.

[313] JX 690 ¶ 11.

[314] *See* Dkts. 95, 97.

59

When Nationstar transferred the escrow account to Servbank, it netted out and retained approximately $13.2 million of servicing advances it was owed before transferring the remaining funds in the escrow account to Servbank.[315] Nationstar now seeks reimbursement of approximately $40.7 million in unpaid servicing advances. Lynx, for its part, asserts that Nationstar breached the Agreement by retaining $13.2 million from the escrow account and seeks that sum in damages.

a.      Nationstar's Entitlement to Servicing Advances

Section 12.01 of the Agreement gives Nationstar the "right to recover and be reimbursed for Servicing Advances."[316] Servicing advances are often reimbursed during a servicing transfer, but the terms of any agreement control.[317] Lynx and Servbank failed to make arrangements "to reimburse the Servicer for amounts the Servicer actually expended pursuant to th[e] Agreement . . . ."[318] The question, then, is when and how Nationstar must be repaid.

Section 4.01(a) of the Agreement contemplates that Nationstar is "solely liable for . . . all Servicing Advances related to the Mortgage Loans" and states that Lynx "shall not be personally liable to advance or reimburse [Nationstar] for" such

---

[315] JX 712 ¶ 8; JX 690 ¶ 11.  The exact amount is $13,227,883.37.

[316] Agreement § 12.01.

[317] *See* Ehinger Tr. 1110 (Nationstar's SVP of Servicing testifying that it is "standard" to "send a single wire [at or shortly] after transfer for reimbursement of expenses"); *see also* Ross Rep. 9.

[318] Agreement § 12.01.

amounts.[319] This provision did not survive the termination of Nationstar as servicer.[320] Nationstar therefore contends that it was entitled to full reimbursement immediately after it transferred the MSRs.

Nationstar's position overlooks that Servbank, as the successor servicer, has discretion to determine when and how Nationstar receives the reimbursement.[321] For example, Servbank could make arrangements to reimburse Nationstar as it receives the advanced funds from borrowers or government guarantors. Until trial, however, neither Servbank nor Lynx proposed a reimbursement plan.

This inaction is inconsistent with Section 12.01 of the Agreement, which entitles Nationstar to reimbursement of servicing advances it made on Lynx's behalf.[322] Nationstar "actually expended" $53.9 million of unpaid servicing

---

[319] *Id.* § 4.01(a).

[320] *Id.* § 10.01 (stating that only "the provisions of Article III, VIII, IX, X, XI, and XII, shall survive notwithstanding the termination or resignation of the Servicer [Nationstar] . . . .").

[321] *Id.* § 12.01; *see supra* note 309 and accompanying text (quoting the relevant provision in full).

[322] Nationstar claims in the alternative that Lynx breached the implied covenant of good faith and fair dealing or was unjustly enriched. *See* Nationstar's Post-trial Answering Br. 104-06. Because Nationstar has prevailed on its contract-based claim, the implied covenant and unjust enrichment counterclaims are moot. *Cf. Pappas v. Tzolis*, 20 N.Y.3d 228, 234 (2012) ("The doctrine of unjust enrichment invokes an 'obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned." (citation omitted)); *Catlyn & Derzee, Inc. v. Amedore Land Developers, LLC*, 166 A.D.3d 1137, 1140 (N.Y. App. Div. 2018) (dismissing a claim for breach of implied covenant of good faith and fair dealing as duplicative of a breach of contract claim).

advances.[323] The advances would have been recoverable in time, but for the servicing transfer.[324] Servbank must therefore arrange to reimburse Nationstar. Below, I address its belated plan to do so.[325]

### b. Nationstar's "Netting"

Although Nationstar is entitled to reimbursement of advanced funds, it engaged in self-help when it retained approximately $13.2 million of the escrow funds it transferred to Servbank. Lynx had to provide those funds to Servbank out of pocket at the time of transfer.[326] Nothing in the Agreement permitted Nationstar to retain the $13.2 million.[327]

Nationstar relies on Section 4.10 of the Agreement, which permits withdrawals from the escrow account "for any other reason as may be permitted by Customary Servicing Procedures."[328] But Article 4 did not survive termination, and Nationstar did not prove the existence of an applicable industry standard that

---

[323] Agreement § 12.01.

[324] JX 690 ¶ 11.

[325] *See infra* Section III.B.

[326] Dkt. 349 at 79.

[327] *See Katel Liab. Co. v. AT&T Corp.*, 607 F.3d 60, 66 (2d Cir. 2010) (explaining that evidence of custom or practice "should not be admitted to *create* an ambiguity in an otherwise clear and unambiguous agreement); *see also* Ehinger Tr. 1135-36 (testifying that whether netting servicing advances in a transfer is permitted "depends on the agreement").

[328] Agreement § 4.10(x); *see* Nationstar's Post-trial Reply Br. on Countercls. (Dkt. 340) 106.

62

authorizes netting.[329]   Sections 10.01 and 12.01 of the Agreement required Nationstar to transfer the escrow funds in full.[330]  Below, I address how Nationstar's improper retention of the funds will be reconciled with its entitlement to reimbursement for servicing advances.[331]

## III.   DAMAGES

Lynx prevailed on its breach of contract claims regarding undisclosed modifications in progress and the failure to complete loss mitigation solutions within 120 days of exiting forbearance.[332]  Lynx is entitled to indemnification damages of $13,604,135 for these breaches.  It is also entitled to payment from Nationstar of the $23,635,329 Servicing Rights Value.  In addition, Lynx proved that it is owed $13,227,883.37, which amount Lynx paid to Servbank after Nationstar withheld it from the transferred escrow funds.[333]

Nationstar prevailed on its counterclaim insofar as it is owed reimbursement for the servicing advances it made on Lynx's behalf.  It is entitled to a portion of the balance now.  Servbank must make arrangements to repay the rest.

---

[329] *See supra* note 320; Young Tr. 693 (stating that it is "not uncommon for the escrow funds to be sent in full").

[330] Agreement §§ 10.01, 12.01.

[331] *See infra* Section III.B.

[332] *See supra* Sections I.A.1.a, I.A.2.b.i.

[333] Lynx and Servbank's Suppl. Submission Regarding Arrangements for Reimbursement of Servicing Advances (Dkt. 346) ("Opening Suppl. Submission") ¶ 18.

## A. Lynx's Damages for Breaches of the Agreement

Lynx seeks repurchase damages under Section 3.03(a) of the Agreement or, in the alternative, indemnification damages under Section 3.03(c). Lynx's damages calculations draw from the expert opinion of Jennifer Press, a Managing Director at investment banking advisor Lincoln International LLC.[334] Press has over 20 years of experience in valuing fixed-income structured products, including trillions of dollars of mortgage loans and MSRs.[335] Her assignment involved computing loan-by-loan losses for, among other things, undisclosed modifications in progress and servicing delays.[336]

Press calculated both repurchase and indemnification damages. I decline to award repurchase damages. But I adopt Press's approach to indemnification damages, which total $13,604,135. As addressed above, Lynx is also entitled to the Servicing Rights Value of $23,635,329 as calculated by MIAC. Pre-judgment interest will be added to these amounts.

### 1. Repurchase Damages

Section 3.03(a) of the Agreement gives Lynx a qualified right to cause Nationstar to repurchase loans that are the subject of a breach. The provision

---

[334] Press Rep. 1. Press later submitted a supplement to her report. JX 2108.

[335] Press Tr. 1034.

[336] Press Rep. 8-9.

requires Lynx to first give Nationstar notice of the breach, followed by a 30-day cure period. If an uncured breach "materially and adversely affects" the loan value, then Nationstar must "repurchase the related Mortgage Loan at the applicable Repurchase Price."[337] The "Repurchase Price" is equivalent to the unpaid principal balance and unpaid interest on each loan, multiplied by the premium above par that Lynx paid to buy the loan.[338]

For undisclosed modifications in progress, Lynx seeks $24,611,671 in repurchase damages—compared to its claimed injury of $5,648,846.[339] As to servicing timeline failures after the end of forbearance periods, it seeks $24,071,425 in repurchase damages compared to $7,955,289 in losses.

I decline to award Lynx repurchase damages for several reasons.

The repurchase remedy explicitly requires that the purported breach of Section 3.01 have a "material[] and adverse[] effect" on the value of the loan.[340] This is a logical requirement. The damaged party recovers indemnification damages unless it shows that a breach caused a material adverse effect on the loan's value, in which case it may seek repurchase damages.

---

[337] Agreement § 3.03(a).

[338] *Id.* § 1.01 (defining the formula to calculate the "Repurchase Price").

[339] Press Rep. 72, tbl. 23; *id.* at App. 19.

[340] Agreement § 3.03(a).

65

Lynx has made no attempt to set a materiality threshold for its losses. Nor has it endeavored to demonstrate that the price impact or risk of loss is significant for loans on which it claims repurchase damages. Instead, Press calculated repurchase damages for any loans where there were indemnification damages greater than zero.[341] Repurchase damages were sought even where the price impact amounted to just 0.003% of the loan's value.[342]

Lynx believes that *any* loss—no matter how slight—satisfies the contractual materiality standard. It argues that, under New York law, a "material and adverse effect" exists if the breach "would have altered the price that a willing purchaser would pay for the loan or otherwise changed the risk of loss on the loan."[343] But New York law—like Delaware—requires that "words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."[344] Lynx's approach would read the word "material" out of Section 3.03(a) of the Agreement.[345] As the Southern District of

---

[341] Press Dep. 119; *see also* Press Tr. 1076-77 (testifying that she was "not opining on materiality").

[342] *See* Press Tr. 1081.

[343] Lynx Opening Post-trial Br. 62 (quoting *U.S. Bank*, 205 F. Supp. 3d at 464); *see also Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 131 (S.D.N.Y. 2014).

[344] *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F. 3d 195, 206 (2d Cir. 2005).

[345] *E.g.*, *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 892 F. Supp. 2d 596, 602 (S.D.N.Y. 2012) (recognizing that "'material' means '[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential'" (quoting Black's

New York has recognized, material adverse effect provisions do not invite "all breaches [to] trigger a cure or repurchase obligation."[346]

Lynx also seeks repurchase damages on 122 loans that were excluded from the schedules to Lynx's December 13, 2022 and August 7, 2023 demand letters.[347] Nationstar was never given notice of or an opportunity to cure any breaches affecting these loans, in contravention of Section 3.03(a) of the Agreement. Repurchase damages are unavailable on these loans.

Accordingly, Lynx has not met its burden of proving its entitlement to repurchase damages.

### 2. Indemnification Damages

With respect to indemnification damages, the Agreement permits Lynx to recover "any and all out-of-pocket costs, damages, expenses, fees . . . and other losses" arising from Nationstar's breaches.[348] Lynx overpaid for loans affected by undisclosed modifications in progress. Lynx also suffered actual losses because of

---

Law Dictionary (7th ed. 1999))); *MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Est. Sec. Inc.*, 2015 WL 764665, at *15 (S.D.N.Y. Jan. 9, 2015) ("The Trusts may rely upon proof that as to a specific loan, there is a *material or significant* increase in the risk of loss." (emphasis added)).

[346] *MASTR*, 2015 WL 764665, at *10.

[347] *See supra* notes 60-62, 86 and accompanying text.

[348] Agreement § 3.03(c).

Nationstar's failure to complete loss mitigation within 120 days forbearance periods ending. Press calculated the associated amounts of Lynx's damages.

### a. Undisclosed Modifications in Progress

Lynx was damaged by Nationstar's failure to disclose rate modifications in progress on purchased loans.[349] An undisclosed rate modification negatively affects the cash flows an investor can expect from the loan, thus reducing its value.[350] If the modifications in progress had been disclosed, Lynx would have paid less for the loans.[351]

For loans with undisclosed modifications in progress, Press began with the set of 1,593 affected loans identified by DelPonti.[352] Her methodology was to compare what Lynx paid for each loan against what Lynx would have been willing to pay had Nationstar given it accurate information. Press created a loan-level discounted cash flow model to understand the effect of the modifications in progress on pricing.[353] Key inputs to her model included: "(i) characteristics of the loans as reported in the

---

[349] *See supra* Section II.A.1.a.

[350] *See* Press Tr. 1039.

[351] *See id.* at 10.

[352] JX 2109 (Press Appendices) App. 20; *see also* DelPonti Rep. 12.

[353] Press Rep. 98-99. Although Lynx similarly weighted resolution paths in its contemporaneous pricing model (JX 1152; JX 50), Press could not simply input the correct information for specific loans into them. Lynx's models were at the pool—not loan— level. Press Tr. 1040.

relevant loan tapes, (ii) historical EBO resolution performance data, (iii) ['to-be-announced' (TBA) prices used to trade MBS], (iv) forward interest rates, and (v) other relevant market data."[354]

Because a typical investor would rely on such data to determine the value it placed on a transaction, Press used it to create "a probabilistic loan level model that takes into account each of the possible [r]esolution [p]aths a mortgage loan can follow to ultimately resolve and either be redelivered to [GNMA] . . . , [r]efinanced, [p]aid in [f]ull, or [l]iquidated."[355]  She performed a discounted cash flow analysis for each of the resolution paths she considered and weighted them.[356]

The weighting Press assigned was different from Lynx's historical weighting when it originally priced the loans.  Press rationally concluded that looking backwards to the COVID-19 period was a poor way to predict performance, and so she used available market information to create forward-looking projections.[357] Data shared by Nationstar's Said, which reflects prepayment rates Nationstar experienced in September 2021, informed and supported Press's modeling assumptions.[358]

---

[354] Press Rep. 76-77.

[355] *Id.*; *see id.* 18-20 (describing the possible resolution paths for EBO loans she assessed).

[356] *See* Press Tr. 1044.

[357] *Id.* at 1047; Press Rep. 98-99; JX 102 (JP Morgan Monthly MBS Strategy report supplying short term projections).

[358] JX 50; Press Tr. 1048.

Press's model supplied two sets of weighted resolution paths for loans with undisclosed modifications in progress. The first assigned probabilities to resolution path outcomes based on the original MLS data for the loans.[359] The second forecasted probabilities using data collected by DelPonti to account for undisclosed modifications.[360] There were significant differences between the resolution path weightings of these sets. For example, the original MLS tape indicated that about 43.1% of the loans would be redelivered through a partial claim.[361] But using the corrected data, the fact that a loan was in the process of modification meant that a partial claim redelivery was no longer expected.[362]

Press applied her model to each of the loans DelPonti identified as a breach.[363] She concluded that some of the loans lacked associated damages. Just 1,353 loans identified by DelPonti had a negative price impact (meaning that 241 loans had no damages).[364] For the 1,353 affected loans, Press concluded that Lynx overpaid Nationstar by $5,648,846.[365]

---

[359] Press Rep. 114, tbl. 21.

[360] *Id.* at 114-15, tbl. 22.

[361] *Id.* at 101-02, 114.

[362] *Id.*

[363] *See id.* at Apps. 10, 13, 16; Press Tr. 1049-50. Press supplied the native Excel spreadsheets showing the loan-by-loan assessment of damages. JX 2109 App. 16.

[364] JX 2109 App. 20.

[365] Press Rep. 114, tbl. 23.

I adopt this amount as a responsible estimate of Lynx's losses. None of the critiques lodged by Nationstar or its expert meaningfully undercut the soundness of Press's methodology.[366]

### b. 120-Day Post-Forbearance Timeline Failure

Lynx was also harmed by Nationstar's failure to complete loss mitigation solutions within 120 days of loans exiting forbearance.[367] Lynx priced its loan purchases on the expectation that Nationstar would abide by relevant federal regulations, including servicing timelines. But Nationstar violated the 120-day rule.

To calculate the economic effect of processing loans too slowly, Press used TBA prices to assess the value Lynx would have received upon redelivery of the loan if Nationstar had timely completed its servicing activities according to the applicable timelines.[368] "TBA prices are an industry-standard proxy for calculating value, because they represent the market price for a given mortgage loan with similar characteristics."[369] Press used TBA prices in her analysis because those are the

---

[366] *See* Lynx and Servbank's Post-trial Reply Br. 52-54 (Dkt. 338) (responding to Nationstar's criticisms). Press's methodology is thorough and comports with industry standards for valuing EBO loans. She is highly experienced in this field. I afford limited weight to the criticisms lodged by Nationstar's damages expert, whose experience valuing EBO loans is limited to this case. Smith Tr. 1526-27.

[367] *See supra* Section II.A.2.b.i.

[368] Press Rep. 116.

[369] *Id*. at 116 n.102.

prices at which the loans are ultimately expected to be resold.[370]  She calculated Lynx's damages as the difference between the TBA price on the expected modification date and the TBA price on the actual modification date.[371]

Press performed this analysis for each of the 1,369 loans DelPonti identified where Nationstar breached the requirement to complete a loss mitigation solution within 120 days of forbearance exit.[372]  Within that universe, Press identified 1,193 loans with price impacts.[373]  She calculated $7,955,289 in indemnification damages for those loans.[374]

I adopt this amount as a responsible estimate of Lynx's losses.

### 3.    Pre-Judgment Interest

Under New York law, pre-judgment interest at a statutory rate of 9%, computed from the day of breach, is mandatory for breach of contract damages.[375] Lynx is entitled to pre-judgment interest on the $13,604,134 of indemnification damages awarded to it plus the Servicing Rights Valuation of $23,635,329.

---

[370] Press Tr. 1055.

[371] *See* Press Rep. App. 17.

[372] DelPonti Rep. 10.

[373] JX 2108 at 1, tbl. 26.

[374] *Id.*

[375] N.Y. C.P.L.R. §§ 5001(a), 5004; *see Rosenblum v. Rosenblum*, 214 A.D.3d 440, 442 (N.Y. App. Div. 2023).

**B.     Damages Related to the Escrow Fund and Servicing Advances**

The parties previously stipulated to a proposed order that addressed the servicing advance funds, which resolved Nationstar's preliminary motion. That stipulated order (the "Servicing Advances Order") requires that funds for reimbursement of servicing advances would be held by a third-party escrow agent pending further order of the court.[376] At post-trial argument, I requested supplemental submissions on reimbursement of servicing advances could proceed after the Servicing Advances Order is lifted.

Lynx and Servbank ask me to address Nationstar's "wrongful self-reimbursement" by crediting the first $13.2 million in reimbursed servicing advances to Lynx.[377] Under this plan, reimbursement above that amount would be made to Nationstar up until Nationstar is made whole for the amounts it expended. Servbank proposed to reimburse Nationstar on a loan-by-loan basis by the 25th

---

[376] Dkt. 145.

[377] Opening Suppl. Submission ¶ 14. Nationstar argues that Lynx and Servbank waived the ability to make this reimbursement proposal. It relies on *Emerald Partners v. Berlin* for the principle that "a party waives an argument by not including it in its brief." 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003), *aff'd*, 840 A.2d 641 (Del. 2003). Delay in fulfilling a contractual obligation is not, however, equivalent to waiving a claim or legal argument in litigation. Servbank was dilatory in waiting until post-trial argument to propose an arrangement for reimbursement of Nationstar's servicing advances. But Section 12.01 grants Servbank latitude to arrange for reimbursement and imposes no time limitation.

calendar day of each month that Servbank recovers the advance on a particular loan.[378]

Nationstar makes a different proposal. It seeks immediate recovery of its servicing advances in full.[379] It believes that Lynx and Servbank should have paid it $40.7 million in servicing advances upon transfer, after netting the $13.2 million that Nationstar already retained.[380]

I adopt the proposal advanced by Lynx and Servbank. As discussed, the Agreement affords Servbank the discretion to craft a reimbursement plan of its choosing.[381] The Agreement does not set the cadence of or deadline for reimbursement. Although Nationstar prefers to receive the advances in a lump sum immediately, the Agreement does not grant it the right to make that call.

When the Servicing Advances Order is lifted, Servbank must promptly implement a plan to pay Nationstar the servicing advances Servbank has recovered

---

[378] Opening Suppl. Submission ¶ 12.

[379] JX 690 at 8.

[380] Nationstar's Response to Countercl. Defs.' Suppl. Submission Regarding Arrangements for Reimbursement of Servicing Advances (Dkt. 351) ¶ 15.

[381] Agreement § 12.01 ("The successor shall make arrangements as it may deem appropriate to reimburse the Servicer for amounts the Servicer actually expended pursuant to this Agreement . . . ."); *see also* Ross Tr. 1368-69 (acknowledging that Section 12.01 gives Servbank "some latitude" to arrange for reimbursement); Meacham Tr. 1005 ("My understanding of [Section 12.01] is that the successor servicer has the latitude to determine how they're going to pull together the funds . . . as they deem appropriate, they can make the arrangements to reimburse."); *see supra* Section II.B.2.

to date. Servbank and Lynx estimate that about $30 million of advances have been recovered.[382] To address the escrow account funds that Lynx was caused to pay to Servbank, the first approximately $13.2 million (out of the $30 million) will be paid to Lynx. The remainder will be paid to Nationstar.[383]

That leaves approximately $24 million to be reimbursed to Nationstar. Going forward, Servbank must monthly remit to Nationstar the servicing advances Servbank recoups. Servbank must make the reimbursement payment to Nationstar by the 25th calendar day of each month, as Servbank proposed.[384]

Nationstar is not entitled to pre-judgment interest on the servicing advances it is reimbursed. It did not bargain for a reimbursement deadline.

## IV. CONCLUSION

Nationstar breached Sections 3.01(a)(x), 3.01(b)(ix), 3.02(a), and 4.01(a) of the Agreement, as set forth above. Lynx is entitled to indemnification damages totaling $13,604,134, and to pre-judgment interest on that sum.

Nationstar also breached Section 9.01 of the Agreement by refusing to step down as servicer upon Lynx's termination. Lynx seeks certain attorneys' fees and costs related to that breach. Lynx also reserves the right to file a fee petition. Within

---

[382] Opening Suppl. Submission ¶¶ 17-18.

[383] *Id.* ¶ 14. Lynx is entitled to pre-judgment interest on this amount to be paid by Nationstar, beginning on the date that Lynx paid the $13.2 million to Servbank.

[384] *Id.* ¶ 12.

14 days of this decision, Lynx is asked to tell the court by letter whether it intends to do so. If it declines to file a fee petition, it may submit a fee affidavit under Rule 88 for the reasonable fees incurred due to Nationstar's breach of Section 9.01.

Lynx also proved that it is owed the full amount of the Servicing Rights Valuation calculated by MIAC, totaling $23,635,329. It is entitled to pre-judgment interest on that amount.

Lynx further proved that Nationstar failed to comply with Section 12.01 by withholding $13.2 million in escrow funds when Servbank was appointed successor servicer. Lynx is entitled to the repayment of those funds from the servicing advances Servbank has recovered to date, which are held in escrow. Nationstar will pay Lynx pre-judgment interest on this sum.

Nationstar prevailed on its counterclaims insofar as it is entitled to reimbursement of servicing advances. Servbank is obligated to promptly reimburse Nationstar for all servicing advances it has recovered to date, less the approximately $13.2 million owed to Lynx. Servbank is to provide monthly servicing advances for the relevant loans to Nationstar, as set forth above. Nationstar and Lynx must cooperate with one another and with Servbank in good faith, including by sharing documentation or information, during the reimbursement process.

Within 30 days, the parties are asked to confer on and file a proposed order to implement this decision. That proposed order should include a provision to lift the Servicing Advances Order.